ROSEMARIE T. RING (State Bar No. 220769)
rose.ring@mto.com
JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
ELIZABETH A. KIM (State Bar No. 295277)
elizabeth.kim@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

Attorneys for Defendant Facebook, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BERT RIDDICK and ALLAN CANDELORE, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>        vs.<br><br>FACEBOOK, INC., and DOES 1-5000,<br><br>                Defendants. | Case No. 3:18-cv-04529-LB<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:    Hon. Laurel Beeler<br>Date:     Feb. 28, 2019<br>Time:     9:30 am<br>Crtrm.:   C, 15th Floor |

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ..............................................................................................1

II.     BACKGROUND AND SUMMARY OF ALLEGATIONS .................................3

III.     LEGAL STANDARDS ......................................................................................6

IV.     ARGUMENT .....................................................................................................6

    A.     Plaintiffs Have Failed to Allege Facts Demonstrating Article III Standing.................6

    B.     Section 230 of the CDA Bars Plaintiffs' Claims Because They Are Premised on Facebook's Publication of Third-Party Content—the Allegedly Discriminatory Ads Created and Targeted by Third-Party Advertisers.......................9

        1.     Facebook Is an Interactive Computer Service Provider ...............................10

        2.     Plaintiffs' Claims Treat Facebook As a Publisher or Speaker .......................11

        3.     Plaintiffs' Claims Are Based on "Information" Provided by Other Information Content Providers .........................................................................12

            (a)     Neutral Ad-Targeting Tools Are Protected by the CDA....................13

            (b)     Plaintiffs' Conclusory Assertion That Facebook Has "Affirmatively Induced" Advertisers to Unlawfully Target Ads Does Not Defeat CDA Immunity ........................................................16

            (c)     *Roommates* Confirms the Applicability of CDA Immunity Here ........................................................................................................17

    A.     Plaintiffs Fail to Allege the Elements of an Unruh Act or Section 51.5 Claim .........18

        1.     Plaintiffs Do Not Allege, and Cannot Allege, Any Intent by Facebook to Discriminate Against Them .......................................................................18

        2.     Plaintiffs Do Not Allege, and Cannot Allege, That Facebook Engaged in Any Conduct Prohibited by the Unruh or Section 51.5 ......................20

        3.     Plaintiffs Lack Statutory Standing to Pursue Their Claims Because They Have Not Alleged, and Cannot Allege, That They Suffered Any Harm.................................................................................................................22

    C.     Plaintiffs' Conclusory Allegations Fail to State a Claim Against Facebook in Its Capacity as an Advertiser.........................................................................................23

V.     CONCLUSION .................................................................................................24

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*Abu Maisa, Inc. v. Google, Inc.*,
  No. 15-cv-06338-JST, 2016 WL 7178580 (N.D. Cal. Dec. 8, 2016) ..........................................23

*Almeida v. Amazon.com, Inc.*,
  456 F.3d 1316 (11th Cir.2006)...........................................................................................9

*Arkansas ACORN Fair Housing, Inc. v. Greystone Dev., Ltd.*,
  160 F.3d 433 (8th Cir. 1998)..............................................................................................9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................................6, 16, 23

*Atlantic Recording Corp. v. Project Playlist, Inc.*,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009) ................................................................................17

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009)...........................................................................................10

*Bass v. County of Butte*,
  458 F.3d 978 (9th Cir. 2006)...........................................................................................24

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003)......................................................................................9, 10

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .........................................................................................................6

*Bennett v. Spear*,
  520 U.S. 154 (1997) .........................................................................................................8

*Caraccioli v. Facebook, Inc.*,
  167 F. Supp. 3d 1056 (N.D. Cal. 2016) .......................................................................10, 11

*Carafano v. Metrosplash.com, Inc.*,
  339 F.3d 1119 (9th Cir. 2003)..........................................................................10, 13, 14, 15

*Chicago Lawyers Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
  519 F.3d 666 (7th Cir. 2008).............................................................................................11

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013) .........................................................................................................7

*Doe v. MySpace, Inc.*,
  629 F. Supp. 2d 663 (E.D. Tex. 2009) ...............................................................................18

# TABLE OF AUTHORITIES
### (Continued)

PAGE

*Dyroff v. Ultimate Software Grp., Inc.*,
No. 17-cv-05359-LB, 2017 WL 5665670 (N.D. Cal. Nov. 26, 2017) ...........................................14

*Earll v. eBay Inc.*,
No. 5:11-CV-00262-EJD, 2012 WL 3255605 (N.D. Cal. Aug. 8, 2012) ....................................19

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) (en banc) ............................................................................. *passim*

*Fair Housing Council of Suburban Phila. v. Main Line Times*,
141 F.3d 439 (3d Cir. 1998) ....................................................................................................7

*Goddard v. Google, Inc.*,
640 F. Supp. 2d 1193 (N.D. Cal. 2009) ................................................................................ *passim*

*Gonzalez v. Google, Inc.*,
282 F. Supp. 3d 1150 (N.D. Cal. 2017) ...............................................................................15

*Herrick v. Grindr, LLC*,
306 F. Supp. 3d 579 (S.D.N.Y. 2018) ...................................................................................15

*Herrick v. Grindr, LLC*,
No. 17-CV-932 (VEC), 2017 WL 744605 (S.D.N.Y. Feb. 24, 2017) .......................................15

*Jane Doe No. 1 v. Backpage.com, LLC*,
817 F.3d 12 (1st Cir. 2016) ..................................................................................................12

*Jones v. Dirty World Entertainment Recordings LLC*,
755 F.3d 398 (6th Cir. 2014)..............................................................................13, 16, 17, 18

*Jurin v. Google Inc.*,
695 F. Supp. 2d 1117 (E.D. Cal. 2010) .................................................................................15

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016)...............................................................................10, 14, 17

*Klayman v. Zuckerberg*,
753 F.3d 1354 (D.C. Cir. 2014) ............................................................................................10

*La Park La Brea A LLC v. Airbnb, Inc.*,
285 F. Supp. 3d 1097 (C.D. Cal. 2017)..................................................................................14

*Levine v. Vilsack*,
587 F.3d 986 (9th Cir. 2009)...................................................................................................8

*Long v. Playboy Enters. International, Inc.*,
565 F. App'x 646 (9th Cir. 2014).........................................................................................18

## TABLE OF AUTHORITIES
### (Continued)

PAGE

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................................7, 8

*Morsa v. Facebook, Inc.*,
    77 F. Supp. 3d 1007 (C.D. Cal. 2014) ..............................................................21

*Moss v. U.S. Secret Service*,
    572 F.3d 962 (9th Cir. 2009) ............................................................................23

*Navarro v. Block*,
    250 F.3d 729 (9th Cir. 2001) ..............................................................................6

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com Inc.*,
    591 F.3d 250 (4th Cir. 2009) ............................................................................10

*Opperman v. Path, Inc.*,
    84 F. Supp. 3d 962 (N.D. Cal. 2015) ..........................................................17, 18

*Optinrealbig.com, LLC v. Ironport Systems, Inc.*,
    323 F. Supp. 2d 1037 (N.D. Cal. 2004) ......................................................10, 11

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) ............................................................................9

*Rosetta Stone Ltd. v. Google Inc.*,
    732 F. Supp. 2d 628 (E.D. Va. 2010) ...............................................................12

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
    144 F. Supp. 3d 1088 (N.D. Cal. 2015) ...........................................................10

*Spann v. Colonial Village, Inc.*,
    899 F.2d 24 (D.C. Cir. 1990) ..............................................................................7

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ...............................................................................6, 7, 8

*United States ex rel. Modglin v. DJO Global, Inc.*,
    114 F. Supp. 3d 993 (C.D. Cal. 2015) .............................................................5, 6

*In re VeriFone Securities Litigation*,
    11 F.3d 865 (9th Cir. 1993) ..............................................................................21

*White v. Square, Inc.*,
    No. 15-cv-04539-JST, 2016 WL 1570009 (N.D. Cal. Apr. 19, 2016).........................23

*Wilson v. Glenwood Intermountain Properties, Inc.*,
    98 F.3d 590 (10th Cir. 1996) ..............................................................................7

**TABLE OF AUTHORITIES**
(Continued)

PAGE

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997)...................................................................................10, 11

**STATE CASES**

*Angelucci v. Century Supper Club*,
   41 Cal. 4th 160 (2007)...........................................................................................22, 23

*Casey v. U.S. Bank National Association*,
   127 Cal. App. 4th 1138 (2005)......................................................................................22

*Emery v. Visa International Service Association*,
   95 Cal. App. 4th 952 (2002)..........................................................................................22

*Fiol v. Doellstedt*,
   50 Cal. App. 4th 1318 (1996)........................................................................................22

*Guz v. Bechtel National, Inc.*,
   24 Cal. 4th 317 (2000)..................................................................................................20

*Harris v. Capital Growth Investors XIV*,
   52 Cal. 3d 1142 (1991)....................................................................................18, 19, 20

*Hill v. StubHub, Inc.*,
   727 S.E.2d 550 (N.C. Ct. App. 2012) .........................................................................15

*Howe v. Bank of America N.A.*,
   179 Cal. App. 4th 1443 (2009)......................................................................................20

*Javorsky v. Western Athletic Clubs, Inc.*,
   242 Cal. App. 4th 1386 (2015)................................................................................20, 21

*Koebke v. Bernardo Heights Country Club*,
   36 Cal. 4th 824 (2005)....................................................................................18, 19, 20

*Koire v. Metro Car Wash*,
   40 Cal. 3d 24 (1985)....................................................................................................20

*Marina Point, Ltd. v. Wolfson*,
   30 Cal. 3d 721 (1982)..................................................................................................20

*Munson v. Del Taco, Inc.*,
   46 Cal. 4th 661 (2009)..................................................................................................18

*Rojo v. Kliger*,
   52 Cal. 3d 65 (1990)....................................................................................................24

## TABLE OF AUTHORITIES
### (Continued)

PAGE

*Sargoy v. Resolution Trust Corp.,*
8 Cal. App. 4th 1039 (1992)..........................................................................20

*Schulz v. Neovi Data Corp.,*
152 Cal. App. 4th 86 (2007)..........................................................................22

*Sunrise Country Club Association v. Proud,*
190 Cal. App. 3d 377 (1987).......................................................................2, 20

*Surrey v. TrueBeginnings,*
168 Cal. App. 4th 414 (2008)....................................................................22, 23

**FEDERAL STATUTES**

Communications Decency Act ("CDA") ........................................................ *passim*

47 U.S.C. § 230(b)(1)-(2)........................................................................9

47 U.S.C. § 230(c)(1) .......................................................................2, 9, 12

47 U.S.C. § 230(e)(3) .........................................................................9

47 U.S.C. § 230(f)(2) ........................................................................11

**STATE STATUTES**

California's Unruh Civil Rights Act ("Unruh Act")
Cal. Civil Code § 51 ..................................................................... *passim*

Cal. Civil Code § 51.5 ..................................................................... *passim*

Cal. Civil Code § 52(a) ................................................................18, 19, 21, 22

**FEDERAL RULES**

Federal Rule of Civil Procedure 12(b)(6) ......................................................1, 6

MOTION TO DISMISS SECOND AMENDED COMPLAINT

## NOTICE OF MOTION TO DISMISS

PLEASE TAKE NOTICE that on February 28, 2019, at 9:30 a.m., before the Honorable Laurel Beeler in Courtroom C on the 15th floor of the above-entitled court located in San Francisco, California, Defendant Facebook, Inc. will and hereby does move to dismiss Plaintiffs' Second Amended Complaint.[1]  This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) and is based on the Notice of Motion and Motion, the Memorandum of Points and Authorities, all pleadings and papers on file, and such other matters as may be presented to this Court.

## STATEMENT OF RELIEF SOUGHT

Facebook seeks an order pursuant to Rule 12(b)(6) dismissing with prejudice the Second Amended Complaint and each of its causes of action for failure to state a claim for relief.

## STATEMENT OF ISSUES TO BE DECIDED

Whether the Second Amended Complaint states a claim upon which relief can be granted.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

### I.    INTRODUCTION

Facebook, Inc. ("Facebook") operates an online advertising platform that allows people to create ads for all types of products and services and target those ads to the potential audiences they believe will most likely be interested in and relate to them.  Advertisers using traditional print and broadcast media have done this for decades by running ads for women's clothing in Vogue and for men's athletic shoes during the Super Bowl, as well as running ads in Spanish on Telemundo and ads with African-American models in Essence or on BET to provide customized messaging.  On Facebook, advertisers may engage in this commonplace practice of targeted advertising by using self-serve tools that allow, but do not require, them to select an audience for their ads.  According to Plaintiffs, Facebook's provision of these neutral, self-serve tools violates California's Unruh Act because *advertisers* may use them to target ads for "products, accommodations, advantages, facilities, privileges, housing, or services" based on protected characteristics, including sex, race, and national origin.  In other words, Plaintiffs contend that the Unruh Act prohibits *all* ad targeting, including those identified above.  Plaintiffs' claims depend on a view of the Unruh Act that is wildly

---

[1] *See* Oct. 18, 2018, Order Continuing Initial CMC and Related Dates, as modified (Dkt. 24).

overinclusive and fail on multiple other independent grounds.

*First*, Plaintiffs do not, and cannot, allege facts demonstrating either Article III standing or statutory standing.  They do not identify a single ad that they believe they would have received but for an advertiser choosing to use the challenged targeting tools—let alone that they suffered actual discrimination or harm as a result of not seeing a specific ad, or that any such harm is traceable to Facebook as opposed to the advertiser who is solely responsible for choosing whether and what targeting tools to use.  Plaintiffs' speculation that advertisers *might* use the challenged targeting tools and that, but for this targeting, Plaintiffs *might* have seen ads that *might* have been more desirable than ads they did see is not sufficient to show standing under Article III or the Unruh Act.

*Second*, the Communications Decency Act ("CDA") bars all of Plaintiffs' claims because they are premised on Facebook's publication of third-party content—certain kinds of ads that are created and targeted by *advertisers* in ways Plaintiffs claim violate the Unruh Act.  Plaintiffs thus seek to hold Facebook liable "as the publisher or speaker" of third-party content in violation of the CDA.  47 U.S.C. § 230(c)(1).  In Plaintiffs' own words, if Facebook "had just published…the information or content in the ads to the Class members, Plaintiffs would not have filed this lawsuit, because there would not have been any unlawful discrimination such as that alleged herein." Second Amended Complaint ("SAC") ¶ 7.  But advertisers, not Facebook, choose what type of ads to place and what targeting options to use, if any.  Facebook's provision of neutral tools that, according to Plaintiffs, some advertisers may use for an unlawful purpose, falls squarely within the scope of CDA immunity.

*Third,* Plaintiffs fail to state any claim under California's Unruh Civil Rights Act, Cal. Civil Code section 51 or related section 51.5 ("Unruh Act").  Plaintiffs do not, and cannot, allege any intent *by Facebook* to discriminate against them, an essential element of any Unruh Act claim.  Moreover, the conduct by Facebook being challenged—the provision of neutral tools that allow, but do not require, advertisers to target ads—does not violate the Unruh Act or section 51.5 as a matter of law.  These statutes prohibit "unreasonable, arbitrary or invidious discrimination," *Sunrise Country Club Ass'n v. Proud*, 190 Cal. App. 3d 377, 380-81 (1987), not all differential treatment of people.  There is nothing unreasonable, arbitrary, or invidious about the provision of neutral tools

MOTION TO DISMISS SECOND AMENDED COMPLAINT

1  that allow advertisers to engage in the commonplace practice of targeting ads to audiences they

2  believe are most likely to relate to and be interested in the products and services they are offering.

3  **II.**      **BACKGROUND AND SUMMARY OF ALLEGATIONS**

4              Facebook provides a general use online advertising platform through which advertisers place

5  ads for all types of products and services using self-serve tools, including tools that allow, but do not

6  require, advertisers to select a target audience for their ads.  SAC ¶¶ 5-6.  Using these neutral tools,

7  advertisers can include or exclude targeting options based on information users provide through

8  their activities on Facebook, such as an interest in content relating to "multicultural affinities,"[2]

9  "Christian," "new parents," and "fit moms."  *Id*. at 12 (Figure 1); *see also id*. ¶¶ 27, 30.  Plaintiffs

10 allege that some of the targeting options are "prox[ies] for … personal characteristics" under the

11 Unruh Act, including "sex, race, color, religion, ancestry, national origin, marital status, citizenship,

12 primary language, [and] immigration status."  *Id*. ¶ 23.  Plaintiffs further allege that the Unruh Act

13 prohibits use of these targeting options in connection with ads for "products, accommodations,

14 advantages, facilities, privileges, employment opportunities, housing, or services—including but not

15 limited to employment opportunities, housing, sales, discounts, [and] coupons." *Id.* ¶¶ 34, 35.

16 According to Plaintiffs, by making these neutral tools available, Facebook "aids, allows, and enables

17 advertisers, including Facebook itself as an advertiser, to engage in discriminatory advertising in

18 violation of the Unruh Act."  *Id*. ¶ 25; *see also id*. ¶¶ 21, 26.

19             But Plaintiffs do not, and cannot, allege that the challenged tools have no lawful purpose.

20 For example, a Spanish-language TV station may target ads by *including* users who have expressed

21 an interest in "Telemundo" or "Hispanic (Spanish dominant)"; a women's clothing store may target

22 ads to women; a yoga studio may target ads to users who have expressed an interest in fit moms;

23 _____

24 [2] As Facebook has explained publicly, including in statements quoted in the complaint, multicultural
   affinity is not based on a user's race or national origin.  Facebook does not collect information on
25 the race or ethnicity of its users, and does not permit users to provide that information in their user
   profiles.  Instead, users become part of a multicultural affinity when, through their activities on
26 Facebook, they express an interest in content related to one or more of the following culture and
   communities:  African-American, Asian-American, Hispanic, Hispanic (Bilingual), Hispanic
27 (Spanish dominant) and/or Hispanic (English dominant).  Because these affinities are based on
   expressed interests and not race or ethnicity, users may be in one or more—or none—of these
28 affinities at a given time and move between them over time as their Facebook activities change.

1  and a Christian organization may target ads seeking members or publicizing events to users who

2  have expressed an interest in Christianity.

3      Advertisers may also choose to target ads by *excluding* users in ways that are lawful and

4  actually promote diversity and inclusion through "parallel advertising."  For example, an advertiser

5  may run two ads on Facebook for the same product—one in Spanish and the other in English.  To

6  avoid duplication, the advertiser may target the Spanish ad to users expressing an interest in

7  Telemundo or the multicultural affinity Hispanic (Spanish dominant) and target the English ad to

8  exclude those audiences because they were already targeted to see the Spanish ad.  This is more

9  efficient for the advertiser and provides a better user experience.

10      Parallel advertising also occurs across media channels, not just on Facebook.  For example,

11  an advertiser may run an ad in Spanish on Telemundo and the same ad in English on Facebook,

12  targeting it to *exclude* users who have expressed an interest in Telemundo, since that audience was

13  already targeted to see the ad on Telemundo.  Similarly, a real estate agent marketing a house she

14  believes is appealing to families may run ads with pictures of the backyard and a playset on local

15  parenting blogs and Facebook targeting it to audiences who have expressed an interest in parenting

16  topics and run ads with pictures of the kitchen on Facebook excluding the same parenting topics

17  because those users were already targeted through ads on Facebook and other advertising media.

18      Plaintiffs assert claims against Facebook based on two distinct but equally meritless theories.

19  *First*, Plaintiffs allege that Facebook—as the operator of an online platform that provides ad

20  targeting tools—"aids, allows, and enables advertisers ... to discriminate against specific groups of

21  users by not publishing, providing or sending ads to certain users."  SAC ¶ 25; *see also*, *e.g.*, *id.* ¶ 21

22  (provision of challenged tools "aids, allows, and enables advertiser[] ... to intentionally exclude

23  specific Facebook users from seeing or hearing certain ads"); *id.* ¶ 24 (provision of challenged tools

24  has "allowed *advertisers* to hide and conceal their illegal discrimination") (emphasis added); *id.* ¶ 26

25  (similar).  *Second*, Plaintiffs allege that Facebook—"itself as an advertiser"—has used targeting

26  tools on the ad platform to place its own discriminatory ads.  *Id.* ¶¶ 2, 25.

27      Plaintiffs' first theory of liability fails because they do not, and cannot, allege any

28  discriminatory intent or conduct by *Facebook*.  Instead, they allege that Facebook "affirmatively

-4-                                3:18-cv-04529-LB
MOTION TO DISMISS SECOND AMENDED COMPLAINT

1    induce[s]" advertisers to use the challenged tools in a discriminatory manner.  SAC ¶ 6.  But

2    Plaintiffs allege no facts whatsoever to support this conclusory assertion, and repeatedly admit that

3    *advertisers*, not Facebook, decide whether and how to use the challenged tools.  *Id.* ¶ 21 (provision

4    of challenged tools "aids, allows and enables *advertisers*" to place discriminatory ads) (emphasis

5    added); *id.* ¶ 25 (same); *id.* ¶ 26 (same).  In fact, Facebook explicitly prohibits advertisers from

6    engaging in such conduct and requires all advertisers to comply with its policies and all applicable

7    antidiscrimination laws.[3]

8         Plaintiffs' second theory of liability against "Facebook itself as an advertiser" fares no better.

9    *Id.* ¶ 2.  Again, Plaintiffs allege no facts to support any claim under the Unruh Act against Facebook

10   for "itself" placing discriminatory ads on Facebook.  Instead, without any factual support, they point

11   to what they assert is a discriminatory employment ad, but these allegations and this ad are

12   irrelevant to Plaintiffs' claims because the Unruh Act does not apply to employment discrimination

13   claims.

14        At bottom, Plaintiffs' claims in this case reflect a fundamental misunderstanding of the

15   Unruh Act and CDA immunity.  Plaintiffs' contention that the Unruh Act prohibits all ad targeting

16   involving protected characteristics is flatly wrong, as it would preclude targeting ads for women's

17   clothing to women, ads for men's athletic shoes to men, and other targeting that is not only

18   reasonable but necessary to the proper functioning of consumer markets.  There is also no basis for

19   Plaintiffs' attempt to impose liability on Facebook for allegedly discriminatory targeting decisions

20   made by advertisers.  There is no violation of the Unruh Act without publication of a discriminatory

21   ad, and there is no publication of a discriminatory ad unless an *advertiser* decides to (1) create an ad,

22   *and* (2) target the ad in a discriminatory manner.  Likewise, if an advertiser decides to do (1) but not

23   (2), or vice versa, there is no discriminatory ad and thus no violation of the Unruh Act.  Facebook's

24

25   _____
     [3] *See* Declaration of Rosemarie T. Ring ("Ring Decl."), Ex. A ("[A]dvertisers may not (1) use our
26   audience selection tools to (a) wrongfully target specific groups of people for advertising …; or (b)
     wrongfully exclude specific groups of people from seeing their ads; or (2) include discriminatory
27   content in their ads."); *see also* Ex. B (Advertising Policy 7.1 mandates that advertisers "must not
     use targeting options to discriminate against … users[.]").  Facebook's motion to dismiss can and
28   should be granted regardless of whether the Court takes judicial notice of these documents, which
     simply provide additional "background for understanding [this] dispute."  *United States ex rel.*

1  provision of these neutral tools—tools that are indisputably used for lawful purposes and at the sole

2  discretion of third-party advertisers—is not only protected by the CDA, it does not come close to

3  establishing the type of "unreasonable, arbitrary, or invidious" practice proscribed by the Unruh Act.

4  **III.   LEGAL STANDARDS**

5      A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d

6  729, 732 (9th Cir. 2001).  A complaint "must contain sufficient factual matter ... to 'state a claim to

7  relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

8  *Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[4]  Though the court accepts all allegations of material

9  fact as true, the Court should not accept mere "labels and conclusions," nor a "formulaic recitation

10  of the elements of a cause of action." *Id.*  "[T]he tenet that a court must accept [a complaint's

11  allegations] as true ... is inapplicable to … mere conclusory statements," which must be evaluated in

12  their "factual context." *Id.*

13  **IV.   ARGUMENT**

14      All of Plaintiffs' claims must be dismissed because they have not alleged facts

15  demonstrating Article III standing.  Moreover, Plaintiffs' first theory of liability—based on the

16  targeting tools Facebook makes available on its ad platform—is foreclosed by the CDA because it

17  seeks to hold Facebook liable for unidentified ads that may have been placed by unnamed third

18  parties and fails to state any claim under the Unruh Act because, among other reasons, Plaintiffs

19  have not and cannot allege any discriminatory intent by Facebook.  Plaintiffs' alternative theory of

20  liability—based on Facebook's activities as an advertiser—also fails because Plaintiffs have not

21  identified a single ad or any facts to support their conclusory assertions that Facebook targeted its

22  own ads to users in violation of the Unruh Act.

23      **A.    Plaintiffs Have Failed to Allege Facts Demonstrating Article III Standing**

24      Plaintiffs' claims must be dismissed because they have not alleged facts demonstrating

25  Article III standing.  The "'irreducible constitutional minimum' of standing consists of three

26  elements":  (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the

27

28  _____
*Modglin v. DJO Global, Inc.*, 114 F. Supp. 3d 993, 998 n.23 (C.D. Cal. 2015); *see* Request for
Judicial Notice at 1-2 (filed concurrently with this motion).

defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Plaintiffs cannot meet this standard.

*First*, Plaintiffs fail to allege any injury in fact.  To do so, they must show that they have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548.  As the Supreme Court recently emphasized, "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist" and must be "'real'" rather than "'abstract.'"  *Id.*  Indeed, "Article III standing requires a concrete injury even in the context of a statutory violation," and a "bare" allegation that the defendant violated the law will not suffice.  *Id.* at 1549.

Plaintiffs' theory is that some unidentified advertisers *may have* decided to use the targeting tools to target certain unidentified ads in ways that Plaintiffs claim are discriminatory, and as a result Plaintiffs didn't see some of these unidentified ads that *may* have been more desirable in some unarticulated way than the ads they did see, and which *may* have led to more desirable opportunities than were otherwise presented to them.  This "speculative chain of possibilities" does not suffice to establish Article III standing.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 (2013) (holding that plaintiffs could not establish Article III standing based on their "highly speculative fear" that the government would unlawfully surveil their communications).

Tellingly, Plaintiffs have failed to identify a single ad they believe they were denied the opportunity to see because of discriminatory targeting.  Even if they could identify such an ad, multiple courts have held that a plaintiff must allege more than exposure to discriminatory advertising to establish Article III standing—rather, the plaintiff must allege that the discriminatory advertising deprived the plaintiff of a *specific* opportunity.  *See, e.g.*, *Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 595-96 (10th Cir. 1996) ("mere receipt of a discriminatory advertisement" is insufficient absent allegation that plaintiff was seeking to "liv[e] in the advertised housing"); *Fair Hous. Council of Suburban Phila. v. Main Line Times*, 141 F.3d 439, 434-44 (3d Cir. 1998) ("that a particular advertisement violates the [FHA] is not sufficient to satisfy the

---

[4] Internal citations and internal quotation marks are omitted throughout unless otherwise noted.

1  requirements of Article III"); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 29 n.2 (D.C. Cir. 1990)

2  (expressing doubt whether mere viewing of an allegedly discriminatory ad creates standing).

3       Plaintiffs do not come close to meeting that standard.  They allege only that, because of the

4  challenged tools, they were "prevented from hearing or seeing ads on [] Facebook" for "products,

5  accommodations, advantages, facilities, privileges, employment opportunities, housing or

6  services—including, but not limited to employment opportunities, housing, sales, discounts,

7  coupons, limited quantities, free shipping, and other special offers, and/or promotions."  SAC ¶¶ 34-

8  35.  Plaintiffs do not identify a single *advertiser* they believe used the challenged tools in this way,

9  let alone any *specific products or services* they believe they were denied the opportunity to see.  Nor

10 have Plaintiffs alleged that the ads they *did* see were less desirable than the ads they believe

11 unnamed advertisers allegedly chose to exclude them from seeing.  Instead, Plaintiffs claim that they

12 were shown some ads but not others—which, given the volume of ads on Facebook, is inevitable—

13 and that unnamed advertisers may have excluded them from seeing ads for unspecified products and

14 services.[5]  Plaintiffs have not and cannot allege any concrete harm.

15      *Second*, even if Plaintiffs could adequately allege an injury in fact (they have not), Plaintiffs

16 cannot allege any injury that is "fairly traceable" to Facebook.  *Spokeo*, 136 S. Ct. at 1547.  To

17 establish traceability, a plaintiff must show that her injury results from "the challenged action of the

18 defendant," and not from "the independent action of some third party not before the court."  *Lujan*,

19 504 U.S. at 560.  Only if the defendant's actions had a "determinative or coercive effect" on the

20 third party's actions can a plaintiff establish standing.  *Bennett v. Spear*, 520 U.S. 154, 169 (1997);

21 *Levine v. Vilsack*, 587 F.3d 986, 995 (9th Cir. 2009).

22      Plaintiffs do not come close to alleging facts sufficient to show fair traceability.  Facebook's

23 provision of neutral tools that allow, but do not require, advertisers to target ads does not have a

24 "determinative or coercive effect," *Bennett*, 520 U.S. at 169, upon advertisers who, according to

25 Plaintiffs, place discriminatory ads on Facebook in violation of the Unruh Act.  *See supra* at 9-14.

[5] Plaintiffs allege that they are "interested in career opportunities and therefore [were] harmed by Facebook and other advertisers not sending him ads" for job opportunities.  SAC ¶¶ 34-35.  But this is not a basis for Article III standing with respect to Plaintiffs' claims under the Unruh Act or section 51.5—because those laws do not cover employment discrimination.  *See infra* at 24.

1    Nor have Plaintiffs adequately linked any asserted injury to any particular ad—much less any

2    specific conduct of Facebook beyond simply making the challenged tools available for use by

3    advertisers.  *See Ark. ACORN Fair Housing, Inc. v. Greystone Dev., Ltd.*, 160 F.3d 433, 434-35 (8th

4    Cir. 1998) (no fair traceability where plaintiff failed to show that any "discriminatory effects" were

5    "*specifically attributable*" to defendant's allegedly discriminatory advertising (emphasis added)).

### B.    Section 230 of the CDA Bars Plaintiffs' Claims Because They Are Premised on Facebook's Publication of Third-Party Content—the Allegedly Discriminatory Ads Created and Targeted by Third-Party Advertisers

8    Plaintiffs seek to hold Facebook liable for discriminatory ads they allege some unidentified

9    third-party advertisers may have placed on Facebook.  But, as Plaintiffs admit, there can be no

10   violation of the Unruh Act without publication of a discriminatory ad, and there can be no

11   publication of a discriminatory ad unless a third-party advertiser creates a certain kind of ad and

12   then chooses to target that ad using the challenged targeting tools in a way that, according to

13   Plaintiffs, is discriminatory.  SAC ¶¶ 17, 25.  In other words, Plaintiffs acknowledge that the

14   advertiser provides both the ad content *and* selects the targeting that Plaintiffs allege *may* result in

15   publication of a discriminatory ad.

16   But the CDA prohibits Plaintiffs from seeking to impose liability on Facebook for publishing

17   third-party content they allege is discriminatory.  Under Section 230 of the CDA, "[n]o provider or

18   user of an interactive computer service shall be treated as the publisher or speaker of any

19   information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The law

20   bars liability "under any State or local law that is inconsistent with this section."  *Id*. § 230(e)(3).

21   Section 230 "establish[es] broad 'federal immunity to any cause of action that would make service

22   providers liable for information originating with a third-party user of the service.'"  *Perfect 10, Inc.*

23   *v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (quoting *Almeida v. Amazon.com, Inc.*, 456

24   F.3d 1316, 1321 (11th Cir.2006)); *Fair Hous. Council of San Fernando Valley v. Roommates.com,*

25   *LLC*, 521 F.3d 1157, 1169 n.24 (9th Cir. 2008) (en banc) (§ 230 extends to claims "under state or

26   federal law").

27   Through Section 230, Congress sought to "encourage the unfettered and unregulated

28   development of free speech on the Internet, and to promote the development of e-commerce."

1  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003); *see* 47 U.S.C. § 230(b)(1)-(2). "Congress

2  recognized the threat that tort-based lawsuits pose" to websites that publish third-party content,

3  *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1044 (N.D. Cal. 2004), and

4  sought to prevent such lawsuits "from shutting down websites and other services on the Internet."

5  *Batzel*, 333 F.3d at 1028 (internal quotation marks omitted). "None of this means, of course, that

6  the original culpable party who posts [unlawful content] would escape accountability," but

7  "Congress made a policy choice" to preempt "tort liability on companies that serve as intermediaries

8  for other parties' potentially injurious messages." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31

9  (4th Cir. 1997). Accordingly, the "CDA has been interpreted to provide a 'robust' immunity" for

10  "websites." *Goddard v. Google, Inc.,* 640 F. Supp. 2d 1193, 1196 (N.D. Cal. 2009) (quoting

11  *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)).

12        Because CDA immunity under Section 230 is intended to protect websites "not only from

13  'ultimate liability,' but also from 'having to fight costly and protracted legal battles,'" courts "aim to

14  resolve the question of § 230 immunity at the earliest possible stage of the case." *Nemet Chevrolet,*

15  *Ltd. v. Consumeraffairs.com Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (quoting *Roommates,* 521 F.3d

16  at 1175). Thus, courts routinely apply the CDA to dismiss cases on the pleadings. *See, e.g.*, *Kimzey*

17  *v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (rejecting the plaintiff's "effort to circumvent the

18  CDA's protections through 'creative' pleading"); *Goddard*, 640 F. Supp. 2d at 1202.

19        CDA immunity applies when (1) the defendant is "a provider or user of an interactive

20  computer service," (2) "whom a plaintiff seeks to treat, under a state law cause of action, as a

21  publisher or speaker," (3) "of information provided by another information content provider."

22  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009). Applying this standard, courts have

23  repeatedly held that Facebook is protected by CDA immunity for claims based on third-party

24  content. *See, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *Caraccioli v.*

25  *Facebook, Inc.*, 167 F. Supp. 3d 1056, 1065-66 (N.D. Cal. 2016); *Sikhs for Justice, Inc. v.*

26  *Facebook, Inc.*, 144 F. Supp. 3d 1088, 1096 (N.D. Cal. 2015). The same is true here.

27        **1.**      **Facebook Is an Interactive Computer Service Provider**

28        It is beyond dispute that Facebook is a provider of an interactive computer service. *See, e.g.*,

1   *Klayman*, 753 F.3d at 1357 ("Facebook qualifies as an interactive computer service because it is a

2   service that provides information to 'multiple users' by giving them 'computer access … to a

3   computer server,' 47 U.S.C. § 230(f)(2)"); *Caraccioli*, 167 F. Supp. 3d at 1065 (same).

4                      **2.    Plaintiffs' Claims Treat Facebook As a Publisher or Speaker**

5          The allegations in the SAC demonstrate that Plaintiffs seek to hold Facebook liable for

6   publishing ads placed by third parties who, according to Plaintiffs, chose to create ads and target

7   them in ways Plaintiffs allege violate the Unruh Act.  Indeed, the SAC calls out Facebook's role as

8   the alleged publisher explicitly, asserting that if Facebook "had just published … the information or

9   content in the ads to the [class members], Plaintiffs would not have filed this lawsuit, because there

10  would not have been any unlawful discrimination such as that alleged herein."  SAC ¶ 7; s*ee also id.*

11  ¶ 1 (alleging "advertisements that were not *published*" to "Facebook users based on users' personal

12  characteristics" (emphasis added)); *id.* ¶ 2 (challenging decisions by "advertisers" to "not *publish*,

13  not provide, and not send information in advertisements to Facebook users," who allegedly "would

14  have benefited from the information in such non-*published* ads" (emphasis added)); *id.* ¶ 8 (alleging

15  that "advertisers have used" the tools on Facebook's ad platform to "not *publish* … information or

16  content to many in Facebook's community" (emphasis added)).  Plaintiffs do not and cannot allege

17  otherwise.

18         Claims seeking to "hold a service provider liable for its exercise of a publisher's traditional

19  editorial functions—such as deciding whether to publish, withdraw, postpone or alter content," are

20  barred by the CDA.  *Optinrealbig.com*, 323 F. Supp. 2d at 1044 (internal quotation marks omitted).

21  Applying this principle, courts consistently hold that publishing third-party ads, even if the ads are

22  discriminatory or otherwise unlawful, falls squarely within the protections of the CDA.  *See, e.g.*,

23  *Chicago Lawyers Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671-72

24  (7th Cir. 2008) (CDA barred claim against Craigslist for publishing allegedly discriminatory

25  housing ads in violation of federal FHA); *Goddard*, 640 F. Supp. 2d at 1195-96 (CDA barred claim

26  premised on "allegedly fraudulent web-based advertisements" published by Google); *Zeran*, 129

27  F.3d at 329 (CDA barred claim premised on allegedly fraudulent third-party ads).

28         Plaintiffs' attempt to frame their claims as challenging Facebook's provision of ad targeting

MOTION TO DISMISS SECOND AMENDED COMPLAINT

tools rather than the publication of discriminatory ads does not change the analysis.  There can be no dispute that allowing advertisers to select the target audience for their ads and publishing ads in accordance with those selections is a traditional publisher function.  For example, newspapers allow advertisers to choose the section in which ads will appear (*e.g.*, sports, personals, local news), and television broadcasters allow advertisers to run ads on certain channels (*e.g.*, ESPN, PBS, BET) and during certain shows (*e.g.*, college football, Sesame Street) depending on the advertisers' preferred audience.  The neutral tools challenged by Plaintiffs provide advertisers on Facebook with the same options.  Publication of ads entails more than blindly displaying them.  It also involves giving advertisers the ability to reach their target audiences.  Courts have thus consistently held in analogous contexts that ad targeting is a traditional publisher function protected by the CDA.  *See, e.g.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 16 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017) (CDA protected tools allowing ad buyers to "target their advertisements" based on geography); *Roommates*, 521 F.3d at 1169 (CDA protected tools allowing users "to specify whether they will or will not receive emails" from others "by means of *user-defined* criteria," even though such tools "might help some users exclude email from other users of a particular race or sex"); *Rosetta Stone Ltd. v. Google Inc.*, 732 F. Supp. 2d 628, 633 (E.D. Va. 2010) (Google's "providing advertisers the ability to refine their keyword term selection" protected by CDA).  This Court should do the same.

### 3. Plaintiffs' Claims Are Based on "Information" Provided by Other Information Content Providers

Plaintiffs' claims are based on unidentified ads, which they allege *may* be discriminatory based on the combined effect of two decisions made by third-party advertisers on Facebook's ad platform:  (1) what to advertise (things enumerated in Unruh Act) and (2) whether and how to target those ads (based on protected classes in the Unruh Act).  Because advertisers, not Facebook, make both of these decisions, Plaintiffs' claims are based on information "provided by another information content provider."  47 U.S.C. § 230(c)(1).  Plaintiffs' allegations concerning Facebook's creation of the challenged tools are simply irrelevant to determining CDA immunity.  It is not enough to "provide a framework that *could be* utilized for proper and improper purposes."

1    *Roommates*, 521 F.3d at 1172 (emphasis added).  What matters is whether, with respect to the

2    content upon which Plaintiffs' claims are based—allegedly discriminatory ads that may have been

3    placed on Facebook's ad platform—Facebook has "materially contribut[ed] to [their] alleged

4    unlawfulness."  *Id*. at 1168.  Facebook has done no such thing.

5                    **(a)    Neutral Ad-Targeting Tools Are Protected by the CDA**

6           The SAC alleges that *Facebook* created the challenged targeting tools and that *advertisers*

7    used them to target ads in violation of the Unruh Act.  SAC ¶ 21 (alleging that Facebook's provision

8    of targeting tools "aids, allows, and enables advertisers ...  to intentionally exclude specific

9    Facebook users from seeing or hearing ads and the information and content in those ads"); *see also,*

10   *e.g.*, *id.* ¶ 24 (ad platform tools have "allowed *advertisers*" to engage in allegedly unlawful ad

11   targeting (emphasis added)); *id.* ¶ 52 ("*ad buyers*" have "used the Ad Platform's … tool[s] to

12   exclude users" based on protected traits (emphasis added)).  There is no allegation, nor can there be,

13   that Facebook decides whether or how the challenged tools are used by advertisers.[6]

14          Facebook's alleged role in creating the challenged neutral tools does not strip it of CDA

15   immunity.  This attempt to creatively plead around the CDA has been repeatedly and rightly rejected

16   by courts across the country in favor of "a relatively restrictive definition of 'information content

17   provider,'" under which a website retains immunity so long as it does not materially contribute to

18   the creation of "the particular information at issue" in the case.  *Carafano*, 339 F.3d at 1123-25.  "A

19   material contribution to the alleged illegality of the content does not mean merely taking action …

20   necessary to the display of allegedly illegal content.  Rather, it means being responsible *for what*

21   *makes the displayed content allegedly unlawful*."  *Jones v. Dirty World Entm't Recordings LLC*, 755

22   F.3d 398, 410 (6th Cir. 2014) (emphasis added).  Here, "what makes the displayed content allegedly

23   unlawful," *id.*, is a combination of the ad content and how it is targeted, both of which are provided

24

---

25   [6] The allegations in the SAC are confused and internally inconsistent.  For instance, while Plaintiffs
26   generally allege that Facebook created the targeting tools, *see, e.g.*, SAC ¶¶ 24-32, Plaintiffs also
     allege that Facebook and unnamed third-party advertisers have "collaborated in creating or
27   developing Facebook's Multicultural Affinity … advertising platform feature and therefore in
     creating or developing the information or content in ads."  *Id.* ¶ 1.  These inconsistencies are
28   immaterial for purposes of the CDA, however, because the dispositive issue remains that Plaintiffs

1  by advertisers, not Facebook.

2          Indeed, the targeting tools challenged by Plaintiffs in this case are exactly the type of

3  "neutral tools" protected by the CDA.  *Roommates*, 521 F.3d at 1171.  Courts uniformly have held

4  that such neutral tools, which facilitate the publication of third-party content and which third parties

5  may use for either "proper or improper purposes," do not "contribute[] materially to the alleged

6  illegality" of third-party content.  *Id.* at 1168, 1172.  They are thus protected by CDA immunity

7  "even if the users committed their misconduct using" such "tools."  *Id.* at 1169 n.24; *see Kimzey*,

8  836 F.3d at 1270 (a "'neutral tool' operating on 'voluntary inputs' ... [does] not amount to content

9  development or creation"); *Dyroff v. Ultimate Software Grp., Inc.*, No. 17-cv-05359-LB, 2017 WL

10  5665670, at *10 (N.D. Cal. Nov. 26, 2017) (holding "website's alleged functionalities—including

11  its user anonymity, algorithmic recommendations of related groups, and the 'push' email

12  notification of posts and responses—are content-neutral tools").  Importantly, such neutral tools are

13  protected *even if* they may be deemed in some sense to "aid[]," "allow[]," or "enable[]" (SAC ¶ 25)

14  third parties in engaging in unlawful conduct.  *See La Park La Brea A LLC v. Airbnb, Inc.*, 285 F.

15  Supp. 3d 1097, 1107 (C.D. Cal. 2017) (holding that website "must have done more than merely

16  encourage[d] the creation of the challenged conduct" to lose CDA immunity).

17          For example, in *Carafano*, a dating website provided its users with a "detailed questionnaire"

18  that included multiple-choice questions where "members select[ed] answers ... from menus

19  providing between four and nineteen options" in creating their profiles.  339 F.3d at 1121.  The

20  plaintiff argued that these menus included "sexually suggestive" phrases that facilitated the creation

21  of a defamatory impersonated profile.  *Id.*  The Ninth Circuit held that "[d]oubtless, the

22  questionnaire facilitated the expression of information by individual users" but the "selection of the

23  content was left exclusively to the user"; thus, the defendant "cannot be considered an 'information

24  content provider'" because "no profile has any content until a user actively creates it."  *Id.* at 1124.

25          Similarly, in *Goddard*, the plaintiff challenged Google's provision of a "Keyword Tool" that

26  "suggest[ed] the phrase 'free ringtone' to advertisers, claiming that "the suggestion of the word

27

28  _____
   do not and cannot allege that Facebook either creates the ad content or decides whether or how
   advertisers use the targeting options.

'free,' when combined with Google's knowledge 'of the mobile content industry's unauthorized charge problems,' makes the Keyword Tool 'neither innocuous nor neutral.'"  640 F. Supp. 2d at 1197.  The court rejected this argument, holding that "[l]ike the menus in *Carafano*, Google's Keyword Tool is a neutral tool.  It does nothing more than provide options that advertisers may adopt or reject at their discretion." *Id*. at 1198; *see also, e.g.*, *Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010) (same); *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150, 1168 (N.D. Cal. 2017) (holding that "Google's targeted ad algorithm" was protected by the CDA as a "neutral tool[]"); *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 562 (N.C. Ct. App. 2012) (pricing tool for tickets that suggested prices above that allowed by law was "a prototypically 'neutral tool'").

Most recently, in *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579 (S.D.N.Y. 2018), the plaintiff alleged that Grindr, an online dating app, had facilitated stalking and harassment by providing tools that enabled the plaintiff's ex-boyfriend to "impersonate [him] by posting fake profiles to Grindr" that invited unwanted sexual advances.  *Id.* at 584.  Like Plaintiffs here, the plaintiff attempted to avoid CDA immunity by arguing that "Grindr contributes to what makes the impersonating profiles offensive" by creating and providing tools such as a "drop-down menu for 'preferred sexual position,'" that were used by the plaintiff's ex-boyfriend to post fake profiles.  *Id*. at 589.  The court rejected this argument emphasizing that "[t]o the extent Grindr contributes to the impersonating profiles, it is through … 'neutral assistance'" in the form of tools that were "available equally to all users and are not intrinsically offensive or unlawful." *Id*.[7]  "There is nothing … illegal about Grindr's drop-down menus, its geolocational function, or its sorting, aggregation, and display functions," even though the defendant had allegedly misused those tools and functions for improper purposes. *Id.* at 590.

The same is true here.  Even accepting Plaintiffs' baseless allegations purporting to explain how the challenged tools are created, they do not subject Facebook to liability in this case.  As Plaintiffs admit, they have no claim without the publication of a discriminatory ad and there is no discriminatory ad unless an advertiser creates an ad and uses the challenged tools to target that ad in

---

[7] A prior ruling by the same court had dismissed an earlier version of the complaint as well.  *See Herrick v. Grindr, LLC*, No. 17-CV-932 (VEC), 2017 WL 744605 (S.D.N.Y. Feb. 24, 2017).

ways Plaintiffs claim are discriminatory.  In other words, "what makes the displayed [ads] allegedly

unlawful," *Jones*, 755 F.3d at 410, is not Facebook's *creation* of neutral tools available for use with

all types of ads, but the actual *use* of those tools by advertisers to place certain types of ads in ways

Plaintiffs claim violate the Unruh Act.

**(b)**    **Plaintiffs' Conclusory Assertion That Facebook Has "Affirmatively Induced" Advertisers to Unlawfully Target Ads Does Not Defeat CDA Immunity**

Perhaps recognizing that the CDA bars their claim against Facebook for the reasons above,

Plaintiffs assert, again without *any* factual support, that Facebook has "affirmatively induced its

advertisers to express illegal preferences of Facebook users" in their ad-targeting decisions.  SAC

¶ 6; *see also id.* ¶ 26 ("the Ad Platform's Multicultural Affinity tool has affirmatively induced [and]

aided … advertisers" to engage in allegedly discriminatory targeting).  Beyond allegations that

Facebook created neutral tools that advertisers can use to target ads and made them available on its

general use ad platform for use with all types of products and services, Plaintiffs offer nothing to

support their assertion that Facebook "induced" advertisers to use the targeting tools in ways

Plaintiffs contend are discriminatory.  Nor could they, as Facebook expressly prohibits

discrimination on its platform, including through use of targeting tools, and requires all advertisers to

comply with these policies and all applicable anti-discrimination laws.[8]  On a motion to dismiss, this

Court need not and should not credit this type of "mere conclusory statement."  *Iqbal*, 556 U.S. at

678.

Indeed, multiple courts have held that such conclusory allegations, asserting that a defendant

has contributed to a third party's creation of content, cannot defeat CDA immunity.  For instance, in

*Goddard*, the plaintiff "allege[d] in conclusory fashion that Google *assisted its AdWords customers

in drafting their advertisements*," but "offered no allegations to support this claim" and "fail[ed] to

explain how Google 'controlled' or 'collaborated' with" advertisers "in the creation of any allegedly

---

[8] *See* Declaration of Rosemarie T. Ring ("Ring Decl."), Ex. A ("[A]dvertisers may not (1) use our audience selection tools to (a) wrongfully target specific groups of people for advertising …; or (b) wrongfully exclude specific groups of people from seeing their ads; or (2) include discriminatory content in their ads."); *see also* Ex. B (Advertising Policy 7.1 mandates that advertisers "must not use targeting

1    fraudulent advertisement."  640 F. Supp. 2d at 1202 (emphasis added).  As the Ninth Circuit has

2    emphasized, "threadbare allegations" of a website's authorship of content "are implausible on their

3    face and are insufficient to avoid immunity under the CDA."  *Kimzey*, 836 F.3d at 1268.  "Were it

4    otherwise, CDA immunity could be avoided simply by reciting a common line that user-generated

5    statements are not what they say they are."  *Id.* at 1268-69.  Plaintiffs cannot "circumvent" the CDA

6    merely by virtue of such "creative pleading."  *Id.* at 1266.

7           Moreover, even if Plaintiffs *had* alleged facts showing that that Facebook actually induced or

8    encouraged advertisers to target their ads in certain ways—which, again, they do not—that still

9    would not defeat CDA immunity.  *See, e.g.*, *Jones*, 755 F.3d at 414 (citing *Roommates* and

10    expressly declining to adopt "encouragement test of immunity under the CDA"); *Opperman v. Path,*

11    *Inc.*, 84 F. Supp. 3d 962, 986-87 (N.D. Cal. 2015) (recognizing that *Jones* "adopted the Ninth

12    Circuit's reasoning in *Roommates.com*" that to forfeit CDA immunity, a website "must have done

13    more than merely 'encourage' the creation of the challenged conduct," but "must have *required*

14    another to create that content" (emphasis added)).

15                   **(c)      *Roommates* Confirms the Applicability of CDA Immunity Here**

16           The neutral targeting tools available on Facebook's ad platform stand in stark contrast to the

17    type of coercive website functionality for which courts have denied CDA immunity—and, in

18    particular, to the situation at issue in *Roommates*.  There, the Ninth Circuit held that where a

19    roommate-search website "***require[d]*** each subscriber to disclose his sex, sexual orientation and

20    whether he would bring children to a household," *and* to "describe his preferences in roommates

21    with respect to the same three criteria," there was no CDA immunity because, under those facts, the

22    website was "the developer, at least in part, of that information."  521 F.3d at 1161, 1166 (emphasis

23    added).  Numerous other courts have correctly interpreted *Roommates* in this way, recognizing that

24    the case "turned entirely on the website's decision to ***force*** subscribers to divulge the protected

25    characteristics and discriminatory preferences 'as a condition of using its services'" and "carved out

26

27    _____

28    options to discriminate against … users[.]"); *see also* Request for Judicial Notice (filed concurrently
      with this motion).

1    only a narrow exception" to CDA immunity.  *Goddard*, 640 F. Supp. 2d at 1198 (emphasis in

2    original).[9]

3            In contrast to the advertising platform at issue in *Roommates*, which was an online housing

4    service used only by housing advertisers, Facebook offers a generic online advertising service that is

5    used to place ads for all types of products and service.  In other words, unlike Roommates.com,

6    Facebook does not require advertisers to place any particular type of ads.  Nor does Facebook

7    require advertisers to use the challenged targeting tools at all, let alone in a way that is allegedly

8    discriminatory.  Instead, as the SAC repeatedly alleges, Facebook's ad platform simply "allows"

9    advertisers to use these tools for any type of ad if they choose.  SAC ¶¶ 21, 24-26.  An Unruh Act

10    violation occurs, according to Plaintiffs, only when an advertiser decides to run a particular kind of

11    ad (one covered by the Unruh Act) and to use neutral targeting tools in a way Plaintiffs claim is

12    discriminatory.  Accordingly, because Plaintiffs do not, and cannot, allege that Facebook *requires*

13    advertisers to place any particular type of ad and target it in a discriminatory manner, Facebook

14    retains its CDA immunity and Plaintiffs' claims are barred in their entirety.

15        **A.**        **Plaintiffs Fail to Allege the Elements of an Unruh Act or Section 51.5 Claim**

16                    **1.**        **Plaintiffs Do Not Allege, and Cannot Allege, Any Intent by Facebook to Discriminate Against Them**

17

18        "[A] plaintiff seeking to establish a case under the Unruh Act must plead and prove

19    intentional discrimination."  *Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142, 1175

20    (1991).[10]  The same is true under section 51.5.  *Long v. Playboy Enters. Int'l, Inc.*, 565 F. App'x

21    646, 647-48 (9th Cir. 2014).  As the California Supreme Court repeatedly has held, the statutory

22    text, and in particular its reference to "'aiding'" and "'inciting'" discrimination, "imply willful,

23    ───────────────

24    [9] *See also, e.g.*, *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 701 (S.D.N.Y. 2009) (*Roommates* "was based solely on the fact that" the website "*required* potential subscribers"

25    to input unlawful content (emphasis in original)); *Doe v. MySpace, Inc.*, 629 F. Supp. 2d 663, 665 (E.D. Tex. 2009) ("[t]he Ninth Circuit repeatedly stated throughout its *en banc* opinion that the

26    Roommates.com website *required* its users to provide certain information as a condition of its use" (emphasis in original)); *Opperman*, 84 F. Supp. 3d at 987 (*Roommates* applies only where a website

27    "required another to create [the] content"); *Jones*, 755 F.3d at 414 (same).

28    [10] The Legislature superseded this intent requirement for Unruh Act claims based on violations of the federal Americans with Disabilities Act of 1990.  *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661,

1  affirmative misconduct on the part of those who violate the Act." *Harris*, 52 Cal. 3d at 1172

2  (quoting Cal. Civ. Code § 52(a)); *see also Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th

3  824, 853 (2005).  Moreover, the Unruh Act and section 51.5 contain a "damages provision allowing

4  for an exemplary award of up to treble the actual damages suffered," as well as a $4,000 statutory-

5  damages provision for *every* violation. *Harris*, 52 Cal. 3d at 1172; *see* Cal. Civ. Code § 52(a).

6  These damages provisions "'reveal[] a desire to punish *intentional and morally offensive* conduct.'"

7  *Koebke*, 36 Cal. 4th at 853 (quoting *Harris*, 52 Cal.3d 1172 (emphasis added)).  Here, Plaintiffs

8  have not alleged any facts remotely suggesting that Facebook acted with any discriminatory intent.

9         Plaintiffs allege no facts demonstrating or even suggesting that Facebook willfully or

10  affirmatively discriminated against users based on a protected characteristic under the Unruh Act.

11  Plaintiffs allege only that Facebook "aids, allows, and enables *advertisers*" to target ads in ways

12  Plaintiffs claims are discriminatory.  SAC ¶ 21 (emphasis added); *see also id.* ¶¶ 21, 24, 25-26.

13  Plaintiffs further allege that "[e]ach of the Class members was not provided or sent ads on their

14  Facebook page as a result of the choices *advertisers* made through the Ad Platform and its … tools."

15  *Id.* ¶ 45 (emphasis added).  These allegations fail to state a claim *against Facebook* because they do

16  not show discriminatory intent *by Facebook* and for good reason—Facebook expressly prohibits

17  advertisers from engaging in discrimination, including through use of targeting tools.  Ring Decl.

18  Ex. A.

19         Plaintiffs cannot avoid this problem by arguing that Facebook has "aid[ed] or incit[ed]" ad

20  buyers' discriminatory choices.  Cal. Civ. Code § 52(a).  These theories of secondary liability, no

21  less than direct liability, require "willful, affirmative" and "intentional and morally offensive

22  conduct."  *Koebke*, 36 Cal. 4th at 853.  Plaintiffs have not alleged, and cannot allege, any facts

23  showing that Facebook encourages, let alone requires, advertisers using its ad platform to engage in

24  unlawful discrimination.  Having failed to identify any discriminatory ads, Plaintiffs have not and

25  cannot plausibly allege that Facebook was specifically aware of any discriminatory ads.  Nor can

26  any discriminatory intent be inferred from Facebook's provision of a "facially neutral" tool used by

27  advertisers, in their sole discretion, to engage in the commonplace practice of targeted advertising.

28
_____
664-65 (2009).  This limited exception is not applicable here.

MOTION TO DISMISS SECOND AMENDED COMPLAINT

1     *Id.* at 854; *see also Earll v. eBay Inc.*, No. 5:11-CV-00262-EJD, 2012 WL 3255605, at *5 (N.D.

2     Cal. Aug. 8, 2012) (dismissing Unruh Act claim where "allegations describe a facially neutral

3     verification policy" and so did not "demonstrate intentional discrimination").

4         Because Plaintiffs have failed to allege discriminatory intent, and instead have affirmatively

5     alleged facts demonstrating the *absence* of such intent, Facebook's motion to dismiss should be

6     granted without leave to amend.[11]

7               **2.**     **Plaintiffs Do Not Allege, and Cannot Allege, That Facebook Engaged in Any Conduct Prohibited by the Unruh Act or Section 51.5**

8

9         The Unruh Act and section 51.5 "prohibit[] only unreasonable, arbitrary or invidious

10    discrimination, not differential treatment based on actual characteristic differences or differences in

11    needs of users." *Sunrise Country Club Ass'n*, 190 Cal. App. 3d at 380-81; *see also Howe v. Bank of*

12    *America N.A.*, 179 Cal. App. 4th 1443, 1447, 1453-54 (2009) (affirming dismissal of Unruh Act and

13    section 51.5 claims based on failure to allege such discrimination).  This is because the

14    "fundamental purpose of the Unruh Civil Rights Act is the elimination of antisocial discriminatory

15    practices—not the elimination of socially beneficial ones." *Sargoy v. Resolution Trust Corp.*, 8 Cal.

16    App. 4th 1039, 1049 (1992).

17        "Invidious discrimination is the treatment of individuals in a manner that is malicious,

18    hostile, or damaging." *Javorsky v. W. Athletic Clubs, Inc.*, 242 Cal. App. 4th 1386, 1404 (2015).

19    Thus, for instance, the Unruh Act and section 51.5 forbid facially discriminatory pricing policies

20    based on unfair and harmful stereotypes, *see Koire v. Metro Car Wash*, 40 Cal. 3d 24, 34 (1985)

21    (discounts for women on "Ladies' Day"), as well as class-based treatment based on alleged

22    "undesirable propensities" of the class, *Marina Point, Ltd. v. Wolfson*, 30 Cal. 3d 721, 725-26

23    (1982) (landlord's exclusion of families).  But the law does not prohibit discriminatory pricing

24    policies that "do[] not perpetuate any invidious stereotypes," *Javorsky*, 242 Cal. App. 4th at 1401

---

25

26 [11] To the extent Plaintiffs may seek to amend to include a "disparate impact" theory of liability, their claims would still fail.  Disparate impact occurs when "regardless of motive, a facially neutral … practice or policy" has a "disproportionate adverse effect on members of [a] protected class." *Guz v.*

27 *Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354 n.20 (2000).  That theory is not available to Plaintiffs here: "'A disparate impact analysis or test does not apply to Unruh Act claims.'" *Koebke*, 36 Cal. 4th at

28 854 (quoting *Harris*, 52 Cal. 3d at 1175).

1    (discounted young adult gym memberships), or policies based on "actual characteristic differences

2    or differences in needs of users," *Sunrise Country Club Ass'n*, 190 Cal. App. 3d at 380-81 (separate

3    "adult" and "family" sections of condo development).

4         Plaintiffs do not allege, and cannot allege, that Facebook has engaged in any unreasonable,

5    arbitrary, or invidious discrimination.  Plaintiffs' claims are based on Facebook's provision of

6    neutral, self-serve tools on its ad platform that, according to Plaintiffs, allow advertisers to target ads

7    in supposedly discriminatory ways.  But developing tools that allow third parties to target ads to the

8    audiences most likely to be interested in seeing them does not amount to "unreasonable, arbitrary, or

9    invidious discrimination."  As discussed above, *see supra* at 3-4, the targeting tools are available for

10   use by advertisers for all types of ads and have many uses that actually promote diversity and

11   inclusion.  Their mere existence is not unlawful, and Plaintiffs do not claim otherwise, nor could

12   they.  *See Javorsky*, 242 Cal. App. 4th at 1395 (differential treatment "may be reasonable, and not

13   arbitrary, in light of the nature of the enterprise or its facilities, legitimate business interests … and

14   public policy").  "[T]argeted advertising … has been practiced as long as markets have been in

15   operation," *Morsa v. Facebook, Inc.*, 77 F. Supp. 3d 1007, 1013 (C.D. Cal. 2014), and it is not

16   unreasonable, arbitrary, or invidious for a website to provide tools that allow advertisers to engage

17   in this routine practice.

18        By way of example, as Plaintiffs allege, advertisers on Facebook can choose to target ads to

19   users who may be looking to purchase a home rather than rent, SAC ¶ 29 & Table 1, or to users who

20   have expressed an interest in content relating to "Expats (Japan)" or "African-American hair," *id.*

21   ¶ 30 & Table 2.  There is nothing "unreasonable, arbitrary, or invidious" about allowing a realtor, a

22   Japanese food restaurant, or a salon specializing in African-American hair to target ads in this way,

23   and Plaintiffs offers no argument to the contrary.  Providing a tool for targeting advertising—even if

24   it is used *by some unspecified advertisers* to engage in unlawful discrimination in violation of

25   Facebook's policies prohibiting such use—does not constitute "unreasonable, arbitrary, or invidious

26   discrimination" *by Facebook*.

27        Nor can Plaintiffs claim that Facebook's provision of the challenged tools constitutes

28   "aid[ing] or incit[ing]" any discrimination.  Cal. Civ. Code § 52(a).  As an initial matter, Plaintiffs'

aiding-and-abetting theory fails because they have not alleged an independent primary violation by any advertiser that could have been "aided and abetted" by Facebook. *See, e.g.*, *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 n.6 (9th Cir. 1993) ("failure to allege an independent, primary" violation defeats claims for "aiding and abetting").[12]  Indeed, Plaintiffs have not identified a single allegedly discriminatory ad.  But even if they could allege a primary violation, Plaintiffs' claims would fail. To prevail on an aiding-and-abetting theory, a plaintiff must also show that a defendant (1) gave "'substantial assistance or encouragement'" to the primary violator, and (2) "'acted *with the intent of facilitating the commission of that tort*.'"  *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144, 1146 (2005) (emphasis in original).  Plaintiffs do not and cannot meet that standard. Facebook has "do[ne] no more than provid[e its] usual, legitimate service" to advertisers, which, even if misused by some to target ads in a discriminatory way, does not amount to substantial assistance or encouragement.  *Schulz v. Neovi Data Corp.*, 152 Cal. App. 4th 86, 94 (2007); *see also Emery v. Visa Int'l Serv. Ass'n*, 95 Cal. App. 4th 952, 963-66 (2002).  Nor have Plaintiffs alleged that Facebook acted with the intent of facilitating any discrimination.  *Supra* at 18-19.

### 3.    Plaintiffs Lack Statutory Standing to Pursue Their Claims Because They Have Not Alleged, and Cannot Allege, That They Suffered Any Harm

Plaintiffs' claims should also be dismissed because they have not alleged facts demonstrating that they have statutory standing.  A plaintiff seeking to bring an Unruh Act or section 51.5 claim must have "standing" to do so.  *Surrey v. TrueBeginnings*, 168 Cal. App. 4th 414, 417 (2008). Courts "have consistently held that an individual plaintiff has standing to bring claims … only if he or she *has been the victim of the defendant's discriminatory act*."  *Id.* at 419 (emphasis in original). "[A] plaintiff cannot sue for discrimination in the abstract, but must actually suffer the discriminatory conduct."  *Angelucci v. Century Supper Club*, 41 Cal. 4th 160, 165 (2007).

Plaintiffs' allegations do not come close to meeting that standard.  Plaintiffs allege that they are Facebook users who were shown some ads but not others—which, given the volume of ads on

---

[12] Because the Unruh Act and section 51.5 provide for liability for anyone who "aids or incites" unlawful discrimination but do not define that term, *see* Cal. Civ. Code § 52(a), the statutes must be interpreted in light of the "common law definition of aiding and abetting."  *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1325 (1996).

1  Facebook, is inevitable—and that unnamed advertisers *may* have targeted unidentified ads in ways

2  that resulting in them not seeing those unidentified ads based on protected characteristics. *See supra*

3  at 4-5, 20-21. They do not allege that they were looking for ads for particular goods or services on

4  Facebook. Nor do they allege that ads they saw were any less desirable than the unidentified ads

5  they may not have seen. These allegations are patently insufficient to demonstrate the type of

6  discriminatory harm necessary to state a claim under the Unruh Act or section 51.5.

7      The court's analysis in *Surrey* is instructive. There, the plaintiff brought an Unruh Act claim

8  against a dating website that charged male users a registration fee, but was free to female users. 168

9  Cal. App. 4th at 417. The male plaintiff "visited TrueBeginnings' website with the intent of

10 utilizing its services," but "after discovering the discrepancy in its charges, he did not … subscribe

11 to or pay for its services." *Id.* The Court of Appeal held that merely visiting the site and

12 encountering the allegedly discriminatory policy was insufficient to establish standing, because the

13 plaintiff "did not suffer discrimination in any sense other than 'in the abstract.'" *Id.* at 420 (quoting

14 *Angelucci*, 41 Cal. 4th at 165). Other courts have applied *Surrey* to find that that the plaintiffs lack

15 Unruh Act standing when they sue based on an alleged discriminatory policy without any allegation

16 that any discriminatory conduct has actually occurred. *See Abu Maisa, Inc. v. Google, Inc.*, No. 15-

17 cv-06338-JST, 2016 WL 7178580, at *3 (N.D. Cal. Dec. 8, 2016) (finding no standing where

18 plaintiff did not attempt to purchase services, but "visited Defendants' websites on a daily basis and

19 … [was] deterred from attempting to become a customer" by defendants' policies) (internal

20 quotation marks omitted); *White v. Square, Inc.*, No. 15-cv-04539-JST, 2016 WL 1570009, at *3-4

21 (N.D. Cal. Apr. 19, 2016) (similar)). The same is true here.

22  **C.  Plaintiffs' Conclusory Allegations Fail to State a Claim Against Facebook in Its Capacity as an Advertiser**

23      Plaintiffs allege for the first time in the SAC that "Facebook itself as an advertiser" has used

24 the challenged tools to target ads in violation of the Unruh Act. SAC ¶¶ 2, 21, 25-26. These

25 conclusory allegations fail to state a claim against Facebook because Plaintiffs do not allege any

26 facts showing that Facebook has actually targeted any ads in violation of the Unruh Act. Plaintiffs

27 simply state, without any factual support, that Facebook has violated the Unruh Act by using the

28

-23-                                3:18-cv-04529-LB
MOTION TO DISMISS SECOND AMENDED COMPLAINT

1  challenged tools.  *See, e.g.*, *id.* ¶ 33.  Such an "allegation of systematic … discrimination, … without

2  any factual content to bolster it, is just the sort of conclusory allegation that the *Iqbal* Court deemed

3  inadequate."  *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009); *see Iqbal*, 556 U.S. at

4  686 (holding that allegation that defendants "discriminated against [plaintiff] on account of his

5  religion, race, and/or national origin" was not well-pleaded fact) (internal quotation marks omitted).

6      The *only* Facebook ad identified by Plaintiffs in the SAC appears to be an ad for a job at

7  Facebook, which Plaintiffs allege was targeted on the basis of age in violation of the Unruh Act.

8  *See* SAC Ex. 1.[13]  But both the ad and the allegation are simply irrelevant to Plaintiffs' purported

9  Unruh Act claims because "the Unruh Civil Rights Act has no application to employment

10  discrimination."  *Rojo v. Kliger*, 52 Cal. 3d 65, 77 (1990); *accord Bass v. County of Butte*, 458 F.3d

11  978, 981 (9th Cir. 2006).  Thus, Plaintiffs have failed to state a claim against Facebook in its

12  capacity as an advertiser.

13  **V.    CONCLUSION**

14      For these reasons, the Court should dismiss Plaintiffs' SAC without leave to amend.

15

16  DATED:  October 31, 2018        MUNGER, TOLLES & OLSON LLP
17                    ROSEMARIE T. RING
                     JONATHAN H. BLAVIN
18                    ELIZABETH A. KIM

19

20                  By:  */s/ Rosemarie T. Ring*
21                     ROSEMARIE T. RING
                   Attorneys for Defendant Facebook, Inc.

22

23

24

25

26

27

28  [13] Plaintiffs attach a screenshot showing that Facebook Careers stated that it "wants to reach people ages 21 to 55," SAC Ex. 1 at 2, but Plaintiffs do not allege how old they are.

-24-                          3:18-cv-04529-LB
MOTION TO DISMISS SECOND AMENDED COMPLAINT