Alfred G. Rava (SBN 188318)
RAVA LAW FIRM
3667 Voltaire Street
San Diego, CA 92106
Tel: 619-238-1993
Fax: 619-374-7288
Email: alrava@cox.net

Attorney for Plaintiffs and Proposed Class Members

UNITED STATES DISTRICT COURT

NORTHERN DISTRIC OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BERT RIDDICK and ALLAN CANDELORE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.; and DOES 1 through 5,000,<br><br>Defendants. | Case No. 3:18-cv-04529-LB<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

All animals are equal, but some animals are more equal than others.

– George Orwell, *Animal Farm*

Plaintiffs, on behalf of themselves and all others similarly situated, allege the following:

**NATURE AND BASIS OF ALL CLAIMS**

1.      This case is about unlawful discrimination on steroids. Facebook and its co-defendant advertisers have intentionally discriminated against tens or hundreds of millions of Facebook users by collaborating in creating and/or developing the information or content in thousands or millions of advertisements that were not published, not provided, and not sent to millions of Facebook users based on users' personal characteristics such as sex, race, color, religion, ancestry, national origin, marital

1

1    status, citizenship, primary language, immigration status, age, or those characteristics added by the

2    courts, all of which are protected from being used to discriminate against people by California Civil

3    Code sections 51 (codification of the Unruh Civil Rights Act) and 51.5. Facebook and its co-defendant

4    advertisers have collaborated in creating or developing Facebook's Multicultural Affinity (née "Ethnic

5    Affinity"[1]) (hereinafter "Multicultural Affinity") advertising platform feature and therefore in creating

6    or developing the information or content in ads that were never published, never provided, and never

7    sent to certain disfavored Facebook users, who are the Class members defined below, based on the

8    users' personal characteristics protected by Civil Code sections 51 and 51.5.

9        2.    Facebook's Multicultural Affinity advertising feature has been used by Facebook and

10   its co-defendant advertisers, including by Facebook itself as an advertiser, to not publish, not provide,

11   and not send information in advertisements to Facebook users who would have benefited from the

12   information in such non-published ads for sales, discounts, coupons, limited quantities, free shipping,

13   or other special offers, promotions, employment opportunities, housing, products, accommodations,

14   advantages facilities, privileges, or services but for the disfavored users' real or perceived personal

15   characteristics protected by Civil Code sections 51 and 51.5.

16       3.    Facebook has also created or developed content in advertisements for Facebook itself

17   that Facebook did not publish, did not provide, and did not send to certain Facebook users based on

18   personal characteristics protected by the Unruh Civil Rights Act and by Civil Code section 51.5. This

19   includes, but is not limited to, Facebook having restricted employment ads for jobs with Facebook to

20

21   _____

22       [1] After Plaintiffs filed their original Complaint in this case, Facebook changed the name
     of its ad platform feature from "Ethnic Affinity" to "Multicultural Affinity." The term
23   "Multicultural Affinity" will be used throughout this Third Amended Complaint to also
     include its former title of "Ethnic Affinity." Also, while this is entitled the "Third
24   Amended Complaint," this is Plaintiff's first amendment to their complaint since
     Facebook removed this case from San Mateo County Superior Court to this U.S.
25   District Court. At the San Mateo County Superior Plaintiffs unilaterally filed a First
     Amended Complaint to exclude members of that Superior Court and Plaintiff's law
26   firm as class members, and the Superior Court granted Plaintiffs leave to file a Second
     Amended Complaint over eighteen months after the original complaint was filed in
27   November of 2016 after Plaintiffs learned more facts about Facebook's ad platform.

28

2

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-04529-LB

1     people "ages 21 to 55" and "ages 25 to 60," which Facebook developed and created but did not publish,

2     provide, or send to Facebook users who Facebook determined or perceived to not be between 21 and

3     55 years old or not be between 25 and 60 years old. Upon information and belief, Facebook also

4     created and developed content in many other advertisements for Facebook's services or products and

5     these other advertisements also utilized Facebook's Multicultural Affinity advertising feature to not

6     publish, not provide, or not send these advertisements to Facebook users based on users' sex, race,

7     color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration

8     status, age, or those characteristics added by the courts.

9         4.     Both Civil Code sections 51 and 51.5 prohibit business establishments such as

10    Facebook and its advertisers from discriminating against people based on any of the personal

11    characteristics listed in Civil Code section 51 and those added by judicial construction, as well as from

12    discriminating against people based on the *perception* that the people being treated unequally bear or

13    possess any of those protected personal characteristics.

14        5.     Defendant Facebook, under the auspices of being a social-networking site, mines,

15    collects, purchases, and assembles into individual profiles countless terabytes of data in multitudes of

16    categories, for whom Facebook claims to be approximately two billion monthly active Facebook users

17    worldwide, as well as on other individuals who do not even have Facebook accounts, in order for

18    Facebook and its advertisers to publish, provide, and send ads to certain groups of Facebook users,

19    and, more importantly, to enable Facebook and its advertisers to not publishing, not providing, and

20    not sending ads to certain other Facebook users. As alleged more fully below, Facebook and its co-

21    defendant advertisers have collaborated to  create, develop, implement, market, and use an advertising

22    platform ("Ad Platform") that has created and developed advertisements for products,

23    accommodations, advantages, facilities, privileges, employment opportunities, housing, and

24    services—including, but not limited to advertisements for sales, discounts, coupons, limited quantities,

25    free shipping, or other special offers—that defendants intentionally have not published, not provided,

26    and not sent to Facebook users based on their real or perceived protected personal characteristics. By

27    purposefully and intentionally collaborating to create, develop, and/or use (1) the "Exclude People"

28    feature, or (2) another feature that advertisers have used to include only certain users with favored

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-04529-LB

1   personal characteristics and thereby exclude those users who are not lucky enough to have the favored
2   personal characteristics (hereinafter "Include People" feature), such as those protected by Civil Code
3   sections 51 and 51.5, defendants have knowingly and intentionally prevented ads and the information
4   and content therein from being published, provided, or sent to users who do not match certain personal
5   characteristics such as "African American (US)," "Asian American (US)," "Immigrant," "Hispanic
6   US – English dominant," "Christian," "Moms," and "people ages 21 to 55 who live or were recently
7   in the United States."

8          6.      Facebook, through its creation, development, implementation, promotion, and
9   marketing of its Multicultural Affinity, Exclude People, or Include People tools, and through its
10  collaboration with its advertisers in the use of these tools, has substantially and affirmatively induced
11  its advertisers to express illegal preferences of Facebook users based on the users' personal
12  characteristics or perceived personal characteristics as assigned secretly by Facebook, all of which are
13  protected by Civil Code sections 51 and 51.5. Facebook, along with its advertisers, have been
14  responsible, in whole or in part, for the creation or development of the offending content. Facebook's
15  substantial affirmative conduct in promoting its advertisers' use of its Multicultural Affinity, Exclude
16  People, or Include People tools for unlawful purposes has resulted in the unlawful discrimination of
17  many Facebook users. All of this conduct, as further detailed below, makes Facebook a creator or
18  developer of the information or content in the ads that are not published, not provided, and not sent to
19  Facebook users based on the users' genuine or perceived protected personal characteristics. Therefore,
20  Facebook is an information content provider for the ads that are published, provided, and sent to
21  Facebook users based on those users' protected personal characteristics, or the perception created by
22  Facebook from data collected by Facebook or acquired by Facebook from other data collection firms
23  of those users' protected personal characteristics.

24         7.      But this Third Amended Complaint concerns the information or content not published,
25  not provided, and not sent to the members of the Class by Facebook and its advertiser co-defendants.
26  If instead of not publishing, not providing, and not sending the information or content in the ads to
27  Class members, defendants had just published, provided, or sent the information or content in the ads
28  to the Class members, Plaintiffs would not have filed this lawsuit, because there would not have been

4

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-04529-LB

1    any unlawful discrimination such as that alleged herein.

2        8.    It is especially troubling that Facebook, whose corporate mission statement is "*to give*

3    *people the power to build community and bring the world closer together*," would create and develop

4    an Ad Platform with its anti-diversity Multicultural Affinity tool that Facebook and its advertisers

5    have used to not publish, not provide, and not send information or content to many in Facebook's

6    community while defendants published, provided, and sent the same information and content to other

7    Facebook community members. This has destroyed any sense of commonality or "community," and

8    has separated the Facebook world into at least two camps: an informed community of Facebook users

9    on one side, and an uniformed community of Facebook users on the other side.

10        9.    After Plaintiffs filed their original Complaint in this case, Facebook COO Sheryl

11   Sandberg announced that Facebook would seemingly at least temporarily disable the "exclude" feature

12   in its Multicultural Affinity tool, as follows:

13        Until we can better ensure that our tools will not be used inappropriately, we are

14        disabling the option that permits advertisers to exclude multicultural affinity segments

15        from the audience for their ads. In addition, all advertisers will have to complete the

16        certification described above when they choose to include any of the multicultural

17        affinity segments. We will also conduct a full review of how exclusion targeting is being

18        used across audience segments, focusing particularly on potentially sensitive segments

19        (e.g., segments that relate to the LGBTQ community or to people with disabilities).

20   Sheryl Sandberg's November 29, 2017, letter to the Congressional Black Caucus. Available at

21   https://www.documentcloud.org/documents/4312370-Facebook-Sheryl-Sandberg-Letter-

22   2017-11-29.html

23        10.    However, Ms. Sandberg's announcement seemingly only temporarily disabled the

24   Exclude People feature with her provisional, "*Until* we can better ensure that our ad tools will not be

25   used inappropriately . . .", emphasis added, language. Moreover, by maintaining that "all advertisers

26   will have to complete the certification described above when they choose to *include* any of the

27   multicultural affinity segments" - emphasis added, Facebook taketh back what it giveth away. This is

28   because whenever people *include* individuals with any favored personal characteristic, such as to

5

1  include African-American, 18 to 55-year-olds, heterosexuals, or Muslims, they exclude individuals

2  with the disfavored personal characteristics, such as Latinos, Asian-Americans, Caucasians, senior

3  citizens, members of the LGBTQ community, or Christians and Jews. This has the same effect as the

4  seemingly temporarily discarded "exclude" feature, but only rebranded with the new, and innocuous-

5  sounding "include" moniker.

6          11.   Ms. Sandberg, as Facebook's COO has stated that "We believe advertisers and us

7  should be held accountable for content and ads."   Plaintiffs, by filing their original Complaint in

8  November of 2016, and by filing this Third Amended Complaint, endeavor to ensure that Facebook

9  and its advertisers are held accountable for their discriminatory practices of withholding content and

10  ads, and that defendants stop their discriminatory practices and finally begin to treat Facebook users

11  around the world equally no matter their sex, race, religion, sexual orientation, citizenship, and other

12  real or perceived protected personal characteristics.

13          12.   Since Plaintiffs' original Complaint was filed in November of 2016, Facebook, in court

14  filings in this case and in a related federal court discrimination lawsuit against Facebook, has attempted

15  to avoid liability by cavalierly throwing its co-defendant advertisers under the bus by implicating its

16  advertisers as the ones solely responsible for creating or developing the information in the ads that

17  were not published, provided, or sent to the Class, which could only have been accomplished by using

18  the Multicultural Affinity tool at the center of this lawsuit. For example, in Facebook's Demurrer to

19  Plaintiffs' First Amended Complaint, Facebook contended, "Because Facebook plays no role in the

20  creation of ads or in the advertiser's targeting decisions, advertisers, not Facebook, are the only

21  "information content provider[s]" of the content at issue. (47 U.S.C. § 230(f)(3).) Nor does it matter

22  that Plaintiffs seek to hold Facebook liable for aiding violations committed by third-party advertisers:

23  such claims are precisely the kind of claims precluded by the [Communications Decency Act]."

24  Facebooks claims that Facebook has nothing to do with advertisers' targeting decisions is

25  demonstrably, patently false, as revealed in the following excerpts from a recent Bloomberg

26  Businessweek article titled "How Facebook Helps Shady Advertisers Pollute the Internet", available

27  at https://www.bloomberg.com/news/features/2018-03-27/ad-scammers-need-suckers-and-facebook-

28  helps-find-them :

6

> "Granted anonymity, affiliates were happy to detail their tricks. They told me that Facebook had revolutionized scamming. The company built tools with its trove of user data that made it the go-to platform for big brands. Affiliates hijacked them. Facebook's targeting algorithm is so powerful, they said, they don't need to identify suckers themselves – Facebook does it automatically."

The Bloomberg article further reads:

> "Affiliates once had to guess what kind of person might fall for their unsophisticated cons, targeting ads by age, geography, or interests. Now Facebook does the work for them. The social network tracks who clicks on the ad and who buys the pills, then starts targeting others whom its algorithm thinks are likely to buy. Affiliates describe watching their ad campaigns lose money for a few days as Facebook gathers data through trial and error, then seeing the sales take off exponentially. "They go out and find the morons for me," I was told by an affiliate who sells deceptively priced skin-care creams with fake endorsements from Chelsea Clinton."

### CALIFORNIA CIVIL CODE SECTIONS 51, 51.5, AND 52 AND CALIFORNIA SUPREME COURT PRECEDENT

13.    Effective January 1, 2016, Civil Code section 51 provides the following:

(a)  This section shall be known, and may be cited, as the Unruh Civil Rights Act.

(b)  All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, employment opportunities, housing, or services in all business establishments of every kind whatsoever.

14.    Civil Code section 51.5 reads, in pertinent part, as follows:

(a)  No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51, or of the person's partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers,

or customers, because the person is perceived to have one or more of those characteristics, or because the person is associated with a person who has, or is perceived to have, any of those characteristics.

15.     Civil Code section 52 which provides the remedies for violations of Civil Code sections 51, 51.5 (and 51.6), reads, in pertinent part, as follows:

> (a) Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6.

16.     Before January 1, 2016, Civil Code section 51 did not include citizenship, primary language, or immigration status in its list of enumerated personal characteristics, and therefore section 51.5, which adopts the personal characteristics listed in section 51, also did not specifically include these three personal characteristics.  But in 2015, the California Legislature passed, and on September 8, 2015, Governor Gerald Brown signed into law, Senate Bill 600, which would become effective on January 1, 2016, and added citizenship, primary language, and immigration status to the personal characteristics enumerated in Civil Code section 51, and therefore adopted by Civil Code section 51.5.

17.     Despite California's many anti-discrimination statutes, California Supreme Court precedent, and California Attorney General and Department of Fair Employment and Housing actions that prohibit businesses operating in California from treating consumers unequally based on protected personal characteristics such as sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, or age, Facebook and its co-defendant advertisers have created, developed, and/or utilized the Multicultural Affinity tool and the discriminatory information and content Facebook and its advertisers provided in Facebook and its advertisers' ads to treat Facebook users unequally by not publishing, not providing, and not sending Facebook users ads and the information or content in those ads based on the users' personal characteristics protected by the Unruh Civil Rights Act and Civil Code section 51.5.

18.     The sole reason or motive for Facebook and its co-defendant advertisers' collaboration to create, develop, and/or utilize the discriminatory Multicultural Affinity tool and its Exclude People and Include People features has been to maximize profit for Facebook and its advertisers, regardless of the discriminatory intent and effect.  The California Supreme Court in the Unruh Civil Rights Act case of *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24 strongly denounced businesses that treated customers unequally based on a protected personal characteristic listed in Civil Code section 51 to maximize profits, as set forth below:

> In *Marina Point*, this court held that the fact that a business enterprise was "'[proceeding] from a motive of rational self-interest'" did *not* justify discrimination. (*Marina Point, supra, 30 Cal.3d at p. 740, fn. 9,* disapproving *Newby v. Alto Riviera Apartments (1976) 60 Cal. App. 3d 288, 302 [131 Cal. Rptr. 547].)* This court noted that "an entrepreneur may pursue many discriminatory practices 'from a motive of rational self-interest,' e.g., economic gain, which would unquestionably violate the Unruh Act. For example, an entrepreneur may find it economically advantageous to exclude all homosexuals, or alternatively all nonhomosexuals, from his restaurant or hotel, but such a 'rational' economic motive would not, of course, validate the practice." (*Marina Point, supra, 30 Cal.3d at p. 740, fn. 9.)* It would be no less a violation of the Act for an entrepreneur to charge all homosexuals, or all nonhomosexuals, reduced rates in his or her restaurant or hotel in order to encourage one group's patronage and, thereby, increase profits.  The same reasoning is applicable here, where reduced rates were offered to women and not men.

*Koire*, 40 Cal.3d at 35.

> The nightclub attempts to justify its price discount as "remedial" because women tend to have lower incomes than men.  This argument appears to be disingenuous at best.  The club's profit motive is obvious.  Jezebel's waives the cover charge for women not because women on the average earn 59 cents for every dollar earned by men (Koziara, Pierson & Johannesson, *The Comparable Worth Issue: Current Status and New Directions* (1983) 34 Lab. L.J. 504, 505), but because it wants to earn as many dollars as it can for itself.  "Ladies' Night" at Jezebel's is not for the benefit of women, but for the benefit of the nightclub.

*Koire*, 40 Cal.3d at 37 n.18.

9

19.    In a subsequent California Supreme Court Unruh Act case of *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 167, the Court, in holding that a business could not charge men more than women to be admitted into a supper club because sex discrimination is prohibited by the Unruh Act, perhaps best summarized the purpose and intent of the Unruh Act as follows:

> The Unruh Civil Rights Act (Civ. Code, § 51 et seq.) must be construed liberally in order to carry out its purpose. The act expresses a state and national policy against discrimination on arbitrary grounds. Its provisions are intended as an active measure that creates and preserves a nondiscriminatory environment in California business establishments by banishing or eradicating arbitrary, invidious discrimination by such establishments. The act stands as a bulwark protecting each person's inherent right to full and equal access to all business establishments (§ 51, subd. (b)). The act imposes a compulsory duty upon business establishments to serve all persons without arbitrary discrimination. The act serves as a preventive measure, without which it is recognized that businesses might fall into discriminatory practices.

## FACEBOOK'S AD PLATFORM AND MULTICULTURAL AFFINITY TOOL

20.    Facebook generates most of its revenue through the sale of advertising. In the second quarter of 2017, Facebook generated $9.16 billion in advertising revenue.

21.    As set out in more detail below, Facebook's Multicultural Affinity tool aids, allows, and enables advertisers, including Facebook itself, to intentionally exclude specific Facebook users from seeing or hearing certain ads and the information or content in those ads. This age-based, sex-based, race-based, etc. exclusion is based on Facebook users' "affinity" groups that are assigned to users by Facebook without the users' knowledge or consent, and which Facebook then uses to determine or perceive to be a person's sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, and/or immigration status or other characteristics or affinities based on the users' Facebook page, users' activity on Facebook and other Facebook owned websites or apps, and countless terabytes of data about its users that Facebook purchases or acquires by other means from various data mining firms and other sources.

22.    Based on a Facebook user's personal characteristics, a user's perceived personal characteristics, their affinity groups, and/or information Facebook has obtained about its users through data and information Facebook has obtained from various data miners, Facebook builds a profile or a perceived profile of that user that is then utilized and accessed by the Ad Platform to determine what users will not receive the information or content published or provided in certain ads.

23.    Affinity groups act as a thinly veiled proxy for, or a perception of, users' personal characteristics as a hidden means to determine who does not receive ads based on characteristics protected from discrimination by Civil Code sections 51 and 51.5. Many of these affinity groups are specifically classified as "demographics" by Facebook and designed to mask Facebook's tracking of protected groupings such as "African American (US)," "Hispanic (US – English Dominant)," "Hispanic (US – Spanish Dominant)," "Asian American (US)," "Christians," and "Moms" in order to enable defendants to not publish, not provide, and not send certain ads and the information in those ads to the Facebook users who have been stereotyped by Facebook into these groupings.

## FACEBOOK'S AD PLATFORM'S MULTICULTURAL AFFINITY TOOL ENABLES ILLEGAL DISCRIMINATION

24.    Facebook's Ad Platform's Multicultural Affinity tool and its Exclude People and Include People features has allowed advertisers to hide and conceal their illegal discrimination in at least two steps.

25.    First, Facebook's Ad Platform's Multicultural Affinity tool aids, allows, and enables advertisers, including Facebook itself as an advertiser, to discriminate against specific groups of users by not publishing, providing, or sending ads to certain users for products, accommodations, advantages, facilities, privileges, housing, or services. (See Figure 1 below.) This can be done by "demographic," "interest," or "behavior." For example, the Ad Platform allows targeting of an ad to the demographic "Renters." or to users who have expressed an interest in or like pages related to "Buying a House."

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-04529-LB

1

**<u>Figure 1</u>**

2



Screen shot from the article by ProPublica entitled "Facebook Lets Advertisers Exclude Users By Race," available at https://www.propublica.org/article/facebook-lets-advertisers-exclude-users-by-race, which shows options from the Facebook Ad Platform's drop-down menus.

26.     Second, the Ad Platform's Multicultural Affinity tool has affirmatively induced, aided, allowed, and enabled advertisers, including Facebook, to click a button labeled "Exclude People" to prevent the information or content in an ad from being published, provided, or sent to users based on certain personal characteristics or certain perceived personal characteristics, such as "African American" or "Hispanic as seen in Figure 1 above), or as "Hispanic (US – Bilingual)" or "Hispanic (US – Spanish dominant)" as seen in Table 2 below. Facebook's Advertiser Help Center has explained that the platform "offers advanced features like the ability to exclude certain characteristics from your target audience." These characteristics include those listed in Civil Code sections 51 and 51.5.

12

27.    Among the "characteristics" or perceived characteristics that can be excluded are "African American (US)," "Asian American (US)," and categories of "Hispanic (US)," the latter broken down into subcategories based on the users' primary language – "bilingual," "English dominant," or "Spanish dominant." Facebook's Multicultural Affinity feature has affirmatively induced advertisers to exclude users based on marital status, by affirmatively inducing advertisers to exclude users such as those who are "Divorced." It has affirmatively induced advertisers to exclude advertisers based on sex by affirmatively inducing advertisers to exclude "Moms." It has affirmatively induced advertisers to exclude users based on religion by excluding users who are "Christian," "Muslim," "Jewish Culture," or "Jews for Judaism." And the Ad Platform has affirmatively induce advertisers to exclude based on national origin, citizenship, or immigration status by affirmatively inducing advertisers to exclude users based on "Expat (All)," which is defined by Facebook as "People whose original country of residence is different from the current country/countries selected above."

28.    Interestingly, Facebook, whose CEO Mark Zuckerberg and COO Sheryl Sandberg are both Caucasians, has not created or developed a feature on it Ad Platform to affirmatively induce advertisers to exclude the demographic or perceived demographic of Whites or Caucasians from being provided or sent ads.

29.    Table 1, below, is a non-exclusive list of the characteristics that are not specifically enumerated in Civil Code sections 51 and 51.5 but are on Facebook's Ad Platform and can be targeted to tailor an advertisement for housing.

**Table 1: Characteristics That Can Be Targeted In Ads to be Tailored to Housing**

Renters
First time homebuyer
Likely to move
Apartment finder
New mover
$8,000 Home Buyer Tax Credit

30.    On the other hand, Table 2 below is a non-exclusive list of the personal characteristics that *are* listed in Civil Code sections 51 and 51.5 and that have been able to be excluded under the Ad Platform, thereby preventing information in certain ads from being published, provided or sent to certain uses based on personal characteristics protected by Civil Code sections 51 and 51.5.

13

**Table 2: Characteristics That Can Be Excluded, Allowing Discrimination Against the Protected Categories of Race, Color, Religion, Sex, Marital Status, National Origin, Citizenship, Primary Language, and Immigration Status**

| Race/Color/ Primary Language | Sex | Marital Status | Religion | National Origin/ Citizenship/Im-migration Status |
|---|---|---|---|---|
| African American (US) | Working Women | Family-based Households | *Christian* | *Expats (All)3* |
| Asian American (US) | Moms | New parents | *Christianity* | *Non-resident Indian and person of Indian origin* |
| Hispanic (US - All) | Big-city moms | Housemate-based Households | *Catholicism* | *Immigrant* |
| Hispanic (US - Bilingual) | Corporate moms | Civil Union | *Mainline Protestant* | *Expats (Mexico)4* |
| Hispanic (US - English dominant) | Fit moms | Divorced | *Jewish culture* | *Expats (Pakistan)* |
| Hispanic (US - Spanish dominant) | Green moms | Domestic Partnership | *Jews for Judaism* | *Expats (Philippines)* |
| African-American hair | Moms of grade school kids | Engaged | *Islam* | *Expats (Indonesia)* |
| African-American Conservatives | Moms of high school kids | Married | *Sunni Islam* | *Expats (India)* |
| African-American Conservatives | Moms of preschool kids | Single | *Shia Islam* | *Expats (Ghana)* |
| Indigenous peoples | New Moms | Widowed | *Hinduism* | *Expats (Japan)* |
| Being Latino | Soccer moms | Parents | *Buddhism* | *Expats (Dominican Republic)* |
| Being Indian | Stay-at-home moms | Expectant parents | *Shinto* | *Expats (Senegal)* |

31.    The content Facebook users see and do not see on their Facebook newsfeed is individualized based on their user profile that Facebook created and controls, including any affinity group, perceived affinity group, personal characteristic, or perceived personal characteristic Facebook has labeled users with, without the users' knowledge. Any user excluded from being sent the information in an advertisement based on one or more of the above affinity groups, perceived affinity groups, personal characteristics, or perceived personal characteristics protected by Civil Code sections

14

51 and 51.5 will thereby be denied the opportunity to see or hear ads and the information or content therein that were never published, provided, or sent to the user's Facebook page.

32. On Facebook's Ad Platform, any ad that is seen by a user must first go through two phases: targeting and delivery. During the ad targeting phase, Facebook helps the advertiser create a "target audience": a list of users who are *eligible*, but not guaranteed, to see a given ad. Because target audiences can be quite large, numbering in the hundreds of thousands or millions, it is often the case that not all of these users will actually see the ad.

33. During the ad delivery phase, Facebook itself makes decisions, independently of the advertiser, about which users within an ad's target audience will actually see the ad. The users to whom Facebook chooses to show an ad can be said to constitute that ad's "actual audience." Facebook makes these delivery decisions based on its own predictions about what kinds of users are most likely to engage with that ad. Advertisers have no meaningful control over Facebook's delivery decisions. Facebook delivers, channels, and executes the advertisements.

34. By creating Lookalike Audiences for advertisers based on its users' protected class status, Facebook develops content that materially contributes to violations of Civil Code sections 51 and 51.5. A Lookalike Audience is a target audience, created by Facebook, that "looks like" a group of people indicated by the advertiser. To create a Lookalike Audience, Facebook starts by soliciting from an advertiser a "source audience," such as a list of phone numbers or e-mail addresses. Once it has this list, Facebook takes several steps to create a new, custom-built target audience (the "Lookalike Audience") for the advertiser. First, Facebook locates user accounts that match the phone numbers, email addresses, or other identifiers in the advertiser-provided source audience. Second, Facebook uses proprietary algorithms to extract "common qualities" of those users based on their demographics, interests, behavior on Facebook, and other personal information. Almost all of this data is unavailable to the advertiser. Finally, Facebook creates a targeting list comprised of new users, who were not included in the source audience but who share common qualities found in the source audience. Facebook describes this new target audience as comprising people who "are similar to (or 'look like')" people in the source audience.

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-04529-LB

35. When creating Lookalike Audiences, Facebook reproduces protected class characteristics of the source audience — including gender, age, and ethnicity — by creating target audiences with similar demographics. This demographic reflection can happen regardless of whether details about protected class features like race are overtly specified by users anywhere on Facebook. Facebook's extensive data about its users includes strong proxies for protected class membership, and these proxies can lead to a Lookalike Audience whose protected status traits match those of the source audience.

36. An illustrative example: From a small source audience of 100 mostly white parents, Facebook could create a Lookalike Audience of hundreds of thousands, if not millions, of people — most of whom are white parents. The advertiser might, or might not, have intended for Facebook to find white parents. In any case, Facebook tells advertisers very little about how it creates Lookalike Audiences, and almost nothing about their demographic composition. Facebook does not appear to warn advertisers that the audiences it creates might be biased, or to provide reasonable ways for advertisers to identify such bias before running their ads. This is just one way that Facebook has created or developed content that contributes to the illegality of its Ad Platform.

37. By creating Lookalike Audiences in this way, Facebook has created or developed content. Moreover, the target audiences that Facebook creates exert control over which users are eligible to see an ad and which users are *entirely excluded by omission*. When target audiences exclude users along protected class lines, those audiences materially contribute to illegality under Civil Code sections 51 and 51.5.

38. Facebook's Lookalike Audience product is not a neutral tool." Lookalike Audiences are simply not analogous to rudimentary dropdown menus or keyword suggestions. Instead, the Lookalike Audiences that Facebook creates for advertisers are unique, distinct, powerful, and legally salient pieces of content. The Lookalike Audience creation process, and indeed the final audience itself, are both thoroughly opaque to the advertiser, depriving the advertiser of opportunity to exercise its own judgment and discretion over that content.

39. In sum, Lookalike Audiences are created by Facebook, not by the advertiser. Advertisers do not know — because Facebook does not tell them — who is in a Lookalike Audience.

16

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-04529-LB

1  Facebook chooses each member of the Lookalike Audience, reaching *beyond* the source audience that
2  the advertiser already knows. Wherever such an audience happens to be racially exclusionary or
3  otherwise discriminatory on protected status grounds, it is Facebook — not the advertiser — that
4  compiles the exclusionary target audience.

5      40.    By making decisions about the delivery of advertisements based on its users' protected
6  class status, Facebook exposes itself to claims under Civil Code sections 51 and 51.5. Once the
7  targeting phase is complete, Facebook decides which users within a target audience will see a given
8  ad. To deliver ads, Facebook conducts billions of automated analyses every day – one each time an ad
9  is displayed – instantaneously filling available ad space as users scroll through its site.

10     41.    These analyses are referred to as "auctions," but the mathematics and judgment
11 Facebook uses are in fact far more complex and opaque than a standard "highest bidder" auction.
12 These auctions determine which ad is shown to a particular user, among all of the ads that the user is
13 eligible to receive by virtue of their inclusion in those ads' target audiences.

14     42.    Facebook does not determine the outcomes of these auctions neutrally, strictly on price.
15 Rather, Facebook seeks to "match the right ad to the right person at the right time" by making its own
16 predictions about which ads the user is most likely to interact with, the perceived "quality" of the ad,
17 and other factors These predictions are based on Facebook's own knowledge about that user's
18 characteristics and past behavior, the behavior of similar users, and whether similar users have
19 interacted with the ads competing in that auction. Like Lookalike Audiences, these predictions can
20 favor or disfavor users based on their protected class status.
21 If Facebook detects a pattern of men interacting with a particular ad, it will automatically and without
22 instruction from or notification to the advertiser steer that ad toward other men in the future. In sum,
23 Facebook itself decides which users within a target audience will (and will not) see a particular ad.
24 And by its own description, Facebook's ad delivery decisions can operate based on protected
25 characteristics. Facebook steers ads away from protected groups. Facebook is inextricably involved
26 with who does and who does not see ads and the information or content in those ads that are placed
27 on its platform.

28

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-04529-LB

43.    Facebook, through the operation of its ad delivery system, independently directs ads based on its users' personal characteristics protected by Civil Code sections 51 and 51.5. Facebook's users, in the normal course of using Facebook's services, cannot help but reveal to Facebook preferences and personal characteristics that enable this discrimination to occur. As a result, Facebook has created and developed content that contributes materially to Facebook violating Civil Code sections 51 and 51.5.

44.    As an example of Facebook's proactive involvement in Facebook's Ad Platform and its Multicultural Affinity tool, Facebook has employed sales and customer support representatives who work one-on-one with Facebook's advertisers to ensure advertisers reap the maximum benefits of Facebook's Ad Platform and its Multicultural Affinity tool.

45.    Facebook has publicly committed to removing "an ad from our platform if the government agency responsible for enforcing discrimination laws tells us that the ad reflects illegal discrimination." But no user can tell whether they are subject to illegal discrimination, because the discrimination occurs with the ads Facebook users are *not* sent and therefore *do not* see or hear. As a result, the problem will not be remedied unless and until Facebook and its advertisers' clandestine intentional discrimination is exposed and the court orders defendants to put an end to this chronic and widespread unlawful discrimination.

46.    Accordingly, Plaintiffs bring their claims under California Civil Code sections 51 and 51.5 against Facebook and its advertisers who have ever engaged in the unlawful and morally offensive conduct of creating, developing, or using the Multicultural Affinity tool to exclude Facebook users from being sent any ads and the information or content in those ads based on the users' sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, age, or those characteristics added by the courts.

## NATURE AND BASIS OF CLAIMS SPECIFICALLY CONCERNING ADVERTISEMENTS FOR JOB OPPORTUNITIES

47.    Upon information and belief, examples of the major employers and employment agencies that have purchased and sent employment advertisements via Facebook that exclude older workers from receiving those advertisements include the following:

18

- **Amazon.com, Inc.**, an e-commerce giant and a named defendant in this action, restricted employment ads to people "ages 18-54," "ages 18 to 50," "ages 28 to 55," and "ages 22 to 40."

- **Arhaus**, an upscale furniture retailer with 70 locations across the United States, restricted employment ads to people "ages 28-55."

- **Capital One**, a massive financial services company, restricted various employment ads to people "ages 22 to 54."

- **Citadel**, an international financial services company, restricted employment ads to people "ages 18 to 40."

- **Cox Communications and Cox Media Group**, both divisions of one of the nation's largest media and telecommunications companies, and named defendants in this action, restricted various employment ads to people "ages 20 to 45," "ages 20 to 50," "ages 19 to 55," and "ages 20 to 55."

- **Defenders**, a leading national installer of security systems, restricted employment ads to people "ages 20 to 40."

- **Facebook, Inc.**, one of the largest technology companies in the world and the operator of the online platforms on which these ads are created, developed, purchased, and displayed, and a named defendant is this action, restricted employment ads to people "ages 21 to 55" and "ages 25 to 60."

- **Fairfield Residential**, a large national residential management company serving around 44,000 residential units in 37 markets, restricted employment ads to people "ages 18 to 45" and "ages 21 to 41."

- **IKEA**, a massive international furniture retailer with 43 stores in the U.S., restricted employment ads to people "ages 18 to 54."

- **Leidos**, a massive federal defense and government contractor, restricted employment ads to people "ages 24 to 54" and "ages 24 to 58."

- **Sleep Number Corp.**, a national mattress retailer, restricted employment ads to people "ages 25 to 54."

- **T-Mobile**, one of the largest wireless companies in the nation and a named Defendant in this

action, restricted employment ads to people "ages 18 to 38" and "ages 18 to 54."

- **Triplebyte,** an employment agency that places workers with hundreds of companies, including major technology companies, restricted employment ads to people "ages 23 to 38."

- **Weichert Realtors**, a national provider of real estate and homeowner services, restricted employment ads to people "ages 20 to 55."

- **Enterprise Rent-a-Car**, a national rental car company, restricted employment ads to people "ages 22 to 40."

- **University of Maryland Medical System**, the medical system of a major public university, restricted employment ads to people "ages 25 to 55."

48.    Upon information and belief, prior to December 2017, job advertising campaigns that Facebook, T-Mobile, Amazon, Cox, and other advertiser defendants were running and sending via Facebook were age-restricted and set an upper age limit on which Facebook users would receive the job advertisements that excluded older people.

49.    Upon information and belief, Facebook, T-Mobile, Amazon, Cox, and other advertiser defendants each sent age-restricted job advertisements and notices to Facebook users who resided, were located, and/or were searching for employment throughout the United States, including in California, the District of Columbia, Ohio, and Maryland.

50.    Upon information and belief, Facebook, T-Mobile, Amazon, Cox, and other advertiser defendants each directed, requested, approved of, and/or authorized Facebook, its agent, to exclude persons above certain ages from receiving their job advertisements or notices that were sent throughout the United States regarding job opportunities throughout the United States, including California, and directed, requested, approved of, and/or authorized Facebook to include as a portion of the job advertisements or notices a statement that the advertiser "wants to reach people" between certain "ages"; and Facebook, the agent of T-Mobile, Amazon, Cox, and other advertiser defendants, executed these directions and requests, thereby excluding older workers from receiving the job advertisements or notices of Facebook, T-Mobile, Amazon, Cox, and other advertiser defendants, and stating that these advertisers "want[] to reach people" between certain "ages."

51.    Upon information and belief, the age-restricted advertisements that Facebook, T-Mobile, Amazon, Cox, and other advertiser defendants purchased, directed, approved of, authorized, and sent advertised jobs and provided information to Facebook users who received the ads about jobs that were located throughout the states where these advertisers hire workers, including jobs in California, the District of Columbia, and Ohio. Accordingly, upon information and belief, all of the job advertisements that Facebook, T-Mobile, Amazon, Cox, and other advertiser defendants sent to Facebook users directed the Facebook users to information about their jobs in California and all of the other states in which these advertisers hire people.

52.    Advertiser defendants, including Facebook, T-Mobile, Amazon, and Cox, purchased, developed, created, and sent their age-restricted job advertisements in and from Facebook's ad platform and business that is located in California.

53.    Advertiser defendants, including Facebook, T-Mobile, Amazon, and Cox, did not send job advertisements via Facebook that targeted older workers, and thus in this critical medium of Facebook job advertising and recruiting the advertiser defendants only targeted younger workers without similarly targeting older workers to receive their job advertisements, and nor did they use other forms of social media to disproportionately target older workers with job advertisements to offset the harm of excluding older workers from receiving their job advertisements via Facebook.

**PARTIES**

54.    At all times relevant hereto, Plaintiff Bert Riddick was an African-American California resident and a Facebook user. He has been harmed by being prevented from hearing or seeing ads on his Facebook page because Facebook's Multicultural Affinity tool prevented ads for Facebook advertisers' products, accommodations, advantages, facilities, privileges, employment opportunities, housing or services—including, but not limited to employment opportunities, housing, sales, discounts, coupons, limited quantities, free shipping, and other special offers, and/or promotions—from being sent to Mr. Riddick's Facebook page based on his personal characteristics protected by Civil Code sections 51 and 51.5, or defendants' perception that Mr. Riddick bore any of these personal characteristics. Mr. Riddick is an IT professional often interested in career opportunities and therefore was harmed by Facebook and other advertisers not sending him ads including, but not limited to, job

21

1    opportunities in the IT field because of his age, which was over 55 at the time the original Complaint
2    was filed.

3        55.    At all times relevant hereto, Plaintiff Allan Candelore was a Hispanic California
4    resident and a Facebook user. He has been harmed by being prevented from hearing, seeing, or
5    otherwise perceiving advertisements on his Facebook page because Facebook's Multicultural Affinity
6    tool prevented ads for Facebook advertisers' products, accommodations, advantages, facilities,
7    privileges, employment opportunities, housing, or services—including, but not limited to employment
8    opportunities, housing, sales, discounts, coupons, limited quantities, free shipping, and other special
9    offers, and/or promotions—from being sent to Mr. Candelore's Facebook page based on his based on
10   his personal characteristics protected by Civil Code sections 51 and 51.5, or defendants' perception
11   that Mr. Candelore bore any of these personal characteristics.  Mr. Candelore is a residential property
12   manager among other jobs, and is often interested in information, including advertisements, about
13   career opportunities and about housing, and therefore Mr. Candelore was harmed by Facebook and
14   other advertisers not sending him ads about housing and other products and services.

15       56.    Plaintiffs are informed and believe, and on that basis allege, that Defendant Facebook,
16   Inc. is an American corporation, headquartered in Menlo Park, California, incorporated under the laws
17   of the State of Delaware, registered with the California Secretary of State as a corporation with Entity
18   Number C2711108, and with a California registered agent for service of process. Facebook owns and
19   operates an online social networking website that allows its users to communicate with each other
20   through the sharing of at least text, photographs, and videos. Part of Facebook's website is an Ad
21   Platform Multicultural Affinity tool that has affirmatively induced its advertisers to express illegal
22   preferences of Facebook users based on the users' personal characteristics or perceived personal
23   characteristics – all of which are protected by Civil Code sections 51 and 51.5, thereby making
24   Facebook a creator and/or developer of the information or content in the ads that are not published,
25   not provided, and not sent to Facebook users based on the users' genuine or perceived protected
26   personal characteristics.

27       57.    Plaintiffs are informed and believe, and on that basis allege, that defendant T-Mobile
28   US, is one of the largest wireless companies in the United States. According to T-Mobile's 2016

22

Annual 10–K report, "T-Mobile provides wireless communications services, including voice, messaging and data, to more than 71 million customers in the postpaid, prepaid and wholesale markets." In 2016, T-Mobile learned $37.2 billion in revenues, and employ approximately 50,000 full-time and part-time employees as of December 16, 2016. The company calls itself the "Un – carrier" that is "Un – satisfy with the status quo" and "Un-afraid to innovate." T-Mobile operates various brands of its wireless communication services, including T-Mobile and Metro PCS, through is owned and operated stores, third-party distributors, and websites. T-Mobile nationally advertises employment opportunities at its stores and other operations that are located in California, and throughout the nation, both for the T-Mobile and MetroPCS brands. T-Mobile recently has been advertising jobs in 42 states, including California, and the District of Columbia. Upon information and belief, T-Mobile has regularly used Facebook's ad platform to send employment advertisements to prospective applicants for a range of positions in its T-Mobile and MetroPCS divisions, including jobs in its retail stores and beyond; and in doing so, T-Mobile has restricted the age range of the population that T-Mobile intended to receive its employment ads to focus on young workers and exclude older workers.

58.    Plaintiffs are informed and believe, and on that basis allege, that defendant Amazon.com, Inc., is one of the largest online retailers in the world, is a Delaware corporation with its headquarters in Seattle, Washington. Amazon sells hundreds of millions of products to American consumers, and employed 341,400 full-time and part-time employees as of December 31, 2016. In 2016, Amazon had $135.9 billion in revenues. Amazon nationally advertises employment opportunities as locations in California, and throughout the United States. Upon information and belief, Amazon has regularly used Facebook's ad platform to send employment advertisements to prospective applicants for a range of positions at Amazon in California, and throughout the United States; and in doing so Amazon has restricted the age range of the population that Amazon intended to receive its employment ads to focus on younger workers and exclude older workers.

59.    Plaintiffs are informed and believe, and on that basis allege, that defendant Cox Communications, Inc. is a broadband communications and entertainment company that provides digital video, telephone, internet, and home security and automation services through its nationwide network. Cox Communications, Inc. is a broadband communications and entertainment company that

provides digital video, telephone, internet, and home security and automation services through its nationwide network. Cox Communications, Inc. is the third largest cable company in the United States. Cox Media Group, LLC is an integrated broadcasting, publishing, direct marketing and digital media company. It owns and operates 14 television stations, more than 60 radio stations, six newspapers, and over 100 digital services. Cox Communications, Inc. and Cox Media Group, LLC are both subsidiaries of Cox Enterprises, Inc., a privately held media company that had more than 20 billion in revenues and 60,000 employees in 2016. Upon information and belief, Cox Communications, Inc. and Cox Media Group, LLC have regularly used Facebook's ad platform to send employment advertisements to prospective applicants for a range of positions at each respective company in California, and throughout the United States, and in doing so have restricted the age range of the population that they intended to receive their employment ads to focus on younger workers and exclude older workers. Upon information and belief, Cox Communications, Inc. and Cox Media Group, LLC share marketing and recruitment personnel and resources to create and send employment advertisements via Facebook.

60.    The true names and capacities of Does 1 through 5,000 are unknown to Plaintiffs and include advertisers who have ever used Facebook's Multicultural Affinity, Exclude People, and/or Include People tools at any time within the statutes of limitation to prevent ads and the information or content in those ads from being published, provided, or sent to Facebook users based on users' personal characteristics protected by California Civil Code sections 51 and 51.5. When the Does' true names and capacities are learned, Plaintiffs will amend this complaint accordingly. Plaintiffs allege that the wrongful acts alleged herein have been committed by defendants and each of them such that each fictitiously named defendant has unequally treated or discriminated against Facebook users based on the users' sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, or immigration status. If or when Plaintiffs learn that there are more than 5,000 Doe defendants, Plaintiffs will seek leave to amend this complaint to add more Doe defendants and substitute the true names of those additional defendants for their Doe numbers.

## JURISDICTION AND VENUE

61.    This Court has subject matter jurisdiction over all of the claims in this action pursuant to 28 U.S.C. § 1332(d)(2), as the matter in controversy exceeds the sum or value of $5 million,

24

1    exclusive of interest and costs, and it is a class action in which members of the plaintiff Class are

2    citizens of different states than defendants. Furthermore, Facebook has consented to this Court having

3    subject matter jurisdiction of all of the claims in this action by having removed the Second Amended

4    Complaint and its causes of action, which remain the same in this Third Amended Complaint, to this

5    Court.

6        62.    This Court has personal jurisdiction over Facebook. There is general jurisdiction over

7    Facebook because Facebook's corporate headquarters are located in this District in Menlo Park,

8    California, Facebook conducts substantial business throughout this District and in the State of

9    California, and Facebook employs thousands of workers in the California. Facebook has consented to

10   this Court asserting personal jurisdiction over Facebook, based on (1) Facebook's Statement of Rights

11   and Responsibilities requires its users to resolve any disputes in the Northern District of California or

12   a state court located in San Mateo County and requires its users to "submit to the personal jurisdiction

13   of such courts for the purpose of litigating all such claims," and (2) Facebook having removed this

14   case from the San Mateo County Superior Court to this Court.

15       63.    This Court has personal jurisdiction over defendants T-Mobile, Amazon, Cox

16   Communications, and Cox Media Group, because upon information and belief, they conduct

17   substantial business throughout this District, employ a substantial number of workers in this District,

18   created and purchased discriminatory ads in this District via Facebook's ad platform that is located in

19   this District, sent such discriminatory ads from this District to Facebook users located in this District

20   and throughout the United States, while they also did not send such ads from this District to Facebook

21   users located in this District and throughout the United States based on users' personal characteristics

22   protected by Civil Code sections 51 and 51.5, including for positions within this District. Defendants

23   have conducted and continue to conduct substantial business throughout California to render the

24   exercise of personal jurisdiction over them by California courts consistent with traditional notions of

25   fair play and substantial justice.

26       64.    Declaratory and injunctive relief is sought and authorized by 28 U.S.C. §§ 2201 and

27   2202.

28

25

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-04529-LB

65.     Venue is proper is proper in this District under 28 U.S.C. § 1391(b)(1), as upon information and belief, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, where all defendants created, developed and/or purchased discriminatory ads via Facebook's ad platform that is located in this District, sent such discriminatory ads from this District to Facebook users located in this District and throughout the United States, while defendants also did not send such ads from this District to Facebook users located in this District and throughout the United States based on users' personal characteristics protected by Civil Code sections 51 and 51.5.

## CLASS ALLEGATIONS

66.     Plaintiffs bring this class action on their own behalf and on behalf of all other persons similarly situated, defined as follows:

> All Facebook users at any time within the three years before the original Complaint in this action was filed, and continuing through the date of trial, who were not sent an advertisement to the users' Facebook page for products, accommodations, advantages, facilities, privileges, employment opportunities, housing, or services because Facebook advertisers and Facebook used Facebook's Multicultural Affinity, Exclude People, or Include People tool to exclude Facebook users from being sent ads and the information or contact in those ads based on the users' sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, age, or those characteristics added by the courts to those characteristics protected by Civil Code sections 51 and 51.5 (the "Class").

67.     Not included in the Class are the following individuals and/or entities: Facebook and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Facebook has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; all judges and their staff members assigned to hear any aspect of this litigation, as well as such judges' immediate family members; and Plaintiffs' counsel and anyone employed by Plaintiffs' counsel.

68.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-04529-LB

69.     This action has been brought and may properly be maintained pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) and (b)(3) because:

      (a)     The Class is so numerous that joinder of all members is impracticable. Upon information and belief, there are approximately 2 billion Facebook users worldwide and approximately160 million Facebook users in the United States. The number of individuals who are members of a protected class under California Civil Code sections 51 and 51.5 and who were registered with Facebook as Facebook users within three years before the filing of the original Complaint in this action is likely to be in tens or hundreds of millions and are readily identifiable and ascertainable through Facebook's records for Facebook users.

      (b)     Common questions of law and fact exist as to all members of the proposed Class. These questions predominate over any questions that affect only individual members of the proposed Class. These common legal and factual questions include:

            (1)     Whether defendants have created, developed, and/or utilized Facebook's Multicultural Affinity, Exclude People, or Include People advertising tools, or collaborated with each other to create and develop information and content via the Multicultural Affinity tool with respect to the sale of products, accommodations, advantages, facilities, privileges, housing, or services, and/or with respect to recruiting and/or advertising for employees which has unequally treated and discriminated against Facebook users based on the users' age, sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, age, or other personal characteristics protected by Civil Code sections 51 or 51.5;

THIRD AMENDED COMPLAINT
Case No. 3:18-cv-04529-LB

(2)    Whether defendants violated the Unruh Civil Rights Act (Civil Code section 51);

(3)    Whether defendants violated Civil Code section 51.5; and

(4)    The amount of statutory damages mandated by Civil Code section 52 that should be levied against defendants.

70.    Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs and the Class have been Facebook users during the class period. Each of the Class members was not provided or sent ads on their Facebook page as a result of the choices advertisers made through the Ad Platform and its Multicultural Affinity, Exclude People, and/or Include People tools. Defendants further used or endeavored to use the contents of Plaintiffs' and Class members' Facebook profile information, Facebook activity, other Facebook websites or apps, and data about Plaintiffs and Class members that Facebook obtained from data mining firms, to generate stereotypes about Facebook users to lump Plaintiffs and Class members within particular groups based on personal characteristics or perceived personal characteristics that are protected by Civil Code sections 51 and 51.5. Plaintiffs and Class members are entitled to statutory damages and injunctive relief as a result of the conduct complained of herein. Moreover, upon information and belief, the conduct complained of herein is unlawful, morally offensive, systemic, and very profitable for defendants. As a result, the representative Plaintiffs, like all other Class members, face substantial risk of the same injury in the future. The factual basis of defendants' conduct is common to all Class members and represents a common thread of conduct resulting in injury to all members of the Class.

71.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. They are members of the proposed Class and have no interests adverse to the interests of the Class. They are champions of equal rights for everyone and are interested in and seek equal treatment for everyone, no matter their sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, or age. Plaintiffs have been treated unequally because of defendants' conduct. This unequal treatment of Plaintiffs provides them with a substantial stake in this action and the incentive to prosecute it vigorously for themselves and for the Class.

72.    Plaintiffs have retained competent counsel who is experienced in prosecuting hundreds of Unruh Civil Rights Act claims for the unequal treatment of consumers by businesses based on consumers' personal characteristics protected by Civil Code sections 51 and 51.5, who is familiar with class actions, and who intends to pursue this action vigorously. Plaintiffs' counsel represented the prevailing plaintiffs/appellants at the California Supreme Court in the landmark Unruh Civil Rights Act case of *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160. *Angelucci* held that African-Americans, Hispanics, women, Christians, Jews, Muslims, gays, lesbians, and other groups discriminated against by businesses do not have to confront a discriminating business and affirmatively assert their right to equal treatment in order to have standing to file an Unruh Act claim.

73.    The Judicial Council regularly asks for Plaintiffs' counsel's advice when the Judicial Council considers amending the CACI jury instructions relating to Civil Code sections 51, 51.5, 51.6, or 52, and the Judicial Council has incorporated several of Plaintiffs' counsel's suggested amendments into its revised jury instructions for these statutes.

74.    Plaintiffs' counsel has voluntarily consulted for the State Bar of California several times to change the Bar's existing or planned discriminatory policies or practices. In 2013, Plaintiffs' counsel convinced the State Bar to amend the application requirements for the Bar Foundation's Diversity Scholarship so that now all law school students, no matter their race, color, or national origin, are eligible for the Bar Foundation's Diversity Scholarships. That same year, Plaintiffs' counsel again voluntarily consulted with the Bar and convinced the Bar, which was concerned about the mental acuity of older members, to scrap its misguided plan to require members of the State Bar of California who were 50 years of age and older, lawyers and judges alike, to (1) pass continuing education courses, (2) pass assessment tests, (3) take classes on how to wind down or pass on their law practice, and (4) undergo peer counseling, presumably from a peer who already passed the above age-based courses, tests, and classes.

75.    Plaintiffs' counsel is currently representing Plaintiff Allan Candelore for Mr. Candelore's Unruh Civil Rights Act age discrimination class action lawsuit against the popular matchmaking app Tinder for its eponymously named Tinder Plus premium service that has charged consumers 30 years of age and older twice as much as consumers under 30 - $19.99/month vs.

$9.99/month – for the exact same matchmaking service. The Los Angeles County Superior Court dismissed Mr. Candelore's lawsuit in late 2015 after sustaining Tinder's demurrer by unwisely ruling that the Unruh Civil Rights Act does not protect people from age discrimination. But on January 29, 2018, in the published opinion of *Allan Candelore v. Tinder, Inc.* (2018) 19 Cal.App.5th 1138, the Court of Appeal righted that wrong by reversing the trial court and ruling that the Unruh Civil Rights Act does indeed prohibit businesses from discriminating against individuals based on their age.

76.    Plaintiffs assert that questions of law or fact common to the Class Members predominate over any questions affecting only individual members.

77.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Most members of the Class were not even aware, and still are not aware, that they were being discriminated against because of the hidden nature of the discriminatory aspects of the Ad Platform and its Multicultural Affinity, Exclude People, and Include People tools utilized by defendants. That is, many members of the class did not know, and still do not know, that they were not being sent ads for job opportunities, products, accommodations, advantages, facilities, privileges, job opportunities, housing, or services because the ad buyers used the Ad Platform's Multicultural Affinity, Exclude People, or Include People tool to exclude the Class members based on their sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, or age. For example, defendants did not tell or notify Class members that they were not being sent certain ads for products, accommodations, advantages, facilities, privileges, job opportunities, housing, or services because the ad buyers had used the Ad Platform's Multicultural Affinity, Exclude People, or Include People tool to exclude users based on their sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, or age. Therefore, absent a class action, members of the Class will not even know they have legally recognizable discrimination claims against defendants. And many, probably most, members of Class to this day still do not realize that defendants did not send them ads for sales, discounts, coupons, special offers, and other promotions because defendants determined, perceived, or guessed that the Class members were a certain disfavored sex, race, religion, etc.

78.    Even if members of the Class themselves could afford such individual litigation, the court system might not. Given the legal and factual issues involved and considering that the Class could number in the tens or hundreds of millions, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which may otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

79.    Defendants have acted in ways generally applicable to the Class, thereby making appropriate final and injunctive relief regarding members of the Class as a whole.

80.    The names and addresses of the putative class members are available from and can be ascertained by Facebook. To the extent required by law, notice will be provided to the prospective class members easily, effectively, and efficiently via Facebook electronically sending notice to its users, or by use of techniques in a form of notice that has been used customarily in class actions, subject to court approval, such as by first-class mail.

81.    Defendants' conduct as described above is unlawful, is capable of repetition, and will continue unless restrained and enjoined by the Court.

## FIRST CAUSE OF ACTION
### Violation Of The Unruh Civil Rights Act, California Civil Code Section 51

82.    Plaintiffs incorporate in this cause of action the allegations contained in the preceding paragraphs of this Complaint as if they were set out in full herein.

83.    Defendants are "business establishments" within the meaning of the Unruh Civil Rights Act.

84.    Through defendants' collaboration in creating, developing, and/or utilizing the Ad Platform's Multicultural Affinity, Exclude People, and Include People tools, defendants have intentionally not published, not provided, and not sent ads and the information or content in those ads to Plaintiffs and members of the Class for products, accommodations, advantages, facilities, privileges,

31

job opportunities, housing, or services based on the Plaintiffs and Class members' sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, age or other protected personal characteristic. Defendants, through their above conduct relating to the Ad Platform's Multicultural Affinity, Exclude People, and Include People tools, have steered advertisements away from Plaintiffs and Class members based on the Facebook users' sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, age or other protected personal characteristics.

85.    Facebook's Multicultural Affinity, Exclude People, and Include People tools were used by Facebook's advertisers and by Facebook to not publish, not provide, and not send ads and the information in those ads to Plaintiffs and members of the Class based on their protected personal characteristics. As a result, Plaintiffs and members of the Class have been harmed by not having an equal opportunity to see or hear ads for products, accommodations, advantages, facilities, privileges, job opportunities, housing, or services.

86.    By virtue of defendants' collaboration in creating, developing, and/or utilizing the Multicultural Affinity, Exclude People, or Include People tools, defendants intentionally denied equal accommodations, advantages, facilities, privileges, job opportunities, housing, or services to Plaintiffs and members of the Class on the basis of their sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, age or other protected personal characteristic. This intentional unequal treatment is prohibited by the Unruh Civil Rights Act, codified as Civil Code section 51.

87.    Facebook, through its creation, development, implementation, promotion, and marketing of its Multicultural Affinity, Exclude People, or Include People tools, and through its collaboration with its advertisers in the use of these tools, has substantially and affirmatively induced its advertisers to express illegal preferences of Facebook users based on the users' personal characteristics or perceived personal characteristics, all of which are protected by Civil Code section 51. Facebook, along with its advertisers, have been responsible, in whole or in part, for the creation or development of the offending content in the ads that are sent or not sent to Class members based on certain protected personal characteristics. Facebook's substantial affirmative conduct in promoting its

advertisers' use of its Multicultural Affinity, Exclude People, or Include People tools for unlawful purposes has resulted in the unlawful discrimination of many Facebook users.

88.    Pursuant to Civil Code section 52, defendants are liable to Plaintiffs and the members of the Class for the statutory damages mandated by Civil Code section 52 for each and every offense, and attorneys' fees that may be determined by the court in addition thereto.

89.    Pursuant to Civil Code section 52, injunctive relief is necessary and appropriate to prevent defendants from repeating their discriminatory actions as alleged above. Plaintiffs are entitled to injunctive relief on behalf of themselves and the Class.

## SECOND CAUSE OF ACTION
### Violation Of California Civil Code Section 51.5

90.    Plaintiffs incorporate in this cause of action the allegations contained in the preceding paragraphs of this Complaint as if they were set out in full herein.

91.    Defendants are "business establishments" within the meaning of California Civil Code section 51.5.

92.    Through defendants' collaboration in creating, developing, and/or utilizing the Ad Platform's Multicultural Affinity, Exclude People, and Include People  tools, defendants have intentionally not published, not provided, and not sent ads and the information or content in those ads to Plaintiffs and members of the Class for products, accommodations, advantages, facilities, privileges, job opportunities, housing, or services based on the Plaintiffs and Class members' sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, or age. Defendants, through their above conduct relating to the Ad Platform's Multicultural Affinity, Exclude People, and Include People tools, have steered advertisements away from Plaintiffs and Class members based on the Facebook users' sex, race, color, religion, ancestry, national origin, marital status, citizenship, primary language, immigration status, age or other protected personal characteristics

93.    Facebook's Multicultural Affinity, Exclude People, and Include People tools were used by Facebook's advertisers and by Facebook itself to not publish, not provide, and not send ads and the

33

information in those ads to Plaintiffs and members of the Class based on their protected personal characteristics. As a result, Plaintiffs and members of the Class have been harmed by not having an equal opportunity to see or hear ads for products, accommodations, advantages, facilities, privileges, job opportunities, housing, or services.

94.    By virtue of defendants' collaboration in creating, developing, and/or utilizing the Multicultural Affinity, Exclude People, or Include People tools, defendants intentionally discriminated against Plaintiffs and the Class and such discrimination is prohibited by Civil Code section 51.5.

95.    Facebook, through its creation, development, implementation, promotion, and marketing of its Multicultural Affinity, Exclude People, or Include People tools, and through its collaboration with its advertisers in the use of these tools, has substantially and affirmatively induced its advertisers to express illegal preferences of Facebook users based on the users' personal characteristics or perceived personal characteristics, all of which are protected by Civil Code section 51.5. Facebook, along with its advertisers, have been responsible, in whole or in part, for the creation or development of the offending content in the ads that are sent or not sent to Class members based on certain protected personal characteristics. Facebook's substantial affirmative conduct in promoting its advertisers' use of its Multicultural Affinity, Exclude People, or Include People tools for unlawful purposes has resulted in the unlawful discrimination of many Facebook users.

96.    Pursuant to Civil Code section 52, defendants are liable to Plaintiffs and the members of the Class for the statutory damages mandated by Civil Code section 52 for each and every offense, and attorneys' fees that may be determined by the court in addition thereto.

97.    Pursuant to Civil Code section 52, injunctive relief is necessary and appropriate to prevent defendants from repeating their discriminatory actions as alleged above. Plaintiffs are entitled to injunctive relief on behalf of themselves and the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1.    Declare that defendants' pattern or practice described above violates California Civil Code sections 51 and 51.5;

2.      Enter an order providing equitable and injunctive relief permanently enjoining defendants from engaging in unequal treatment of Facebook users in violation of Civil Code sections 51 and 51.5, specifically permanently enjoining defendants from employing or utilizing Facebook's Multicultural Affinity tool in such a way that defendants unequally treat or discriminate against Facebook users based on any of the personal characteristics protected by California Civil Code sections 51 and 51.5;

3.      Certify a Class under Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil procedure, appoint Plaintiffs' counsel as Class Counsel, and appoint the named Plaintiffs as the Class Representatives;

4.      For statutory damages mandated by and pursuant to California Civil Code section 52 for each and every offense committed by defendants against Plaintiffs and each member of the Class;

5.      For an award of reasonable attorneys' fees pursuant to Civil Code section 52 and Code of Civil Procedure section 1021.5, and an award of litigation costs reasonably incurred; and

6.      For such other and further legal and equitable relief as this Court may deem proper, appropriate, justified, or equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and 29 U.S.C. § 623(c)(2), Plaintiffs hereby demand a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

Dated: November 19, 2018                     Respectfully Submitted

                                             _/s/ Alfred G. Rava_
                                             Alfred G. Rava (Cal. Bar No. 188318)
                                             RAVA LAW FIRM
                                             3667 Voltaire Street
                                             San Diego, California 92106
                                             Phone: 619-238-1993
                                             Fax: 619-374-7288
                                             E-mail: alrava@cox.net
                                             *Attorney for Plaintiffs and the Proposed Class*

35